UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE VNET GROUP, INC. SECURITIES
LITIGATION

23 Civ. 11187 (DEH)

**OPINION
AND ORDER**

DALE E. HO, United States District Judge:

In this action, Lead Plaintiff Wong Tan ("Lead Plaintiff") and Plaintiff Michael Semerak (together, "Plaintiffs") bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5, on behalf of themselves and other persons and entities that purchased or otherwise acquired VNET American depositary shares ("ADSs" or "VNET securities") between March 23, 2022, and February 17, 2023, inclusive (the "Class Period").

Defendant VNET is "an internet and data center service provider which operates throughout China." Am. Compl. ¶ 2, ECF No. 34. Defendant Josh Sheng Chen ("Sheng Chen") is a co-founder of VNET and has "served as the Executive Chairman of the Company's Board from the founding of the Company through the present." *Id.* ¶ 30. Defendant Jie Dong was the CEO from September 2022 through the end of the Class Period. *See id.* ¶ 31. Defendant Samuel Shen was the Company's CEO from September 2020 until September 2022. *See id.* ¶ 32. Defendant Tim Chen was the Company's CFO at all relevant times. *See id.* ¶ 33.

In substance, Plaintiffs allege that Defendants made misleading representations to conceal the fact that Sheng Chen was in default on a $50.25 million loan, threatening his controlling stake in VNET; this, in turn, risked triggering one of two conditions that together would accelerate more than $850 million in debts owed by VNET, and thereby threaten to shut down the company.

1

Defendants move to dismiss under Rules 8(a), 9(b), and 12(b)(6) for failure to state a claim.[1]  *See* ECF No. 36.  For the reasons given below, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.  Specifically, Defendants' motion is granted as to Plaintiffs' scheme liability claim, which is duplicative of their Section 10(b) claim.  The motion is denied in all other respects.

## BACKGROUND

The following facts are taken from the Amended Complaint and are assumed to be true solely for purposes of adjudicating Defendants' motion.  *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

VNET (formerly known as 21Vianet, Inc.) went public in 2011.  Am. Compl. ¶ 4.  From the time VNET went public through the beginning of the Class Period, Sheng Chen, by virtue of his stake in VNET "controlled its Board of Directors for which he served as Executive Chairman, and maintained substantial voting power."  *Id.* ¶ 5.  "Just prior to the Class Period, Sheng Chen owned approximately 8.8% of total outstanding ordinary shares but had approximately 28.6% of the aggregate voting power due to his ownership of supra-voting share classes."  *Id.*

### A. Sheng Chen's Facility Agreement with Bold Ally and VNET's Financing Arrangements with Blackstone and Citicorp

On August 19, 2021, Sheng Chen—through a personal holding company of which he is the sole owner and operator, GenTao—entered into a loan agreement (the "Facility Agreement") to obtain a $50.25 million loan from a company called Bold Ally (Cayman) Limited ("Bold Ally").  *Id.* ¶¶ 3, 6.  "Under the Facility Agreement, which was known to VNET and its senior executives at all relevant times, Sheng Chen personally guaranteed the loan and pledged all of his shares in

---

[1] Unless otherwise stated, all references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

VNET and those held by his personal holding companies as collateral . . ." *Id.* ¶ 6. The Facility Agreement had two key provisions:

- **The Early Termination Provision**.  The Facility Agreement had an early termination clause which stated that if VNET's securities' share price fell below a $8.50 for two consecutive trading days, Bold Ally could cancel the loan and demand full payment on the loan within ten business days of notice. *See id.* ¶¶ 7, 55.

- **The Event of Default Provision**.  "The Facility Agreement also contained a provision under which it would be an event of default if a calculation of certain pledged Class A shares fell below a threshold of $63,000,000, which would occur if the ADS share price dropped below approximately $11.80." *Id.*

In November and December 2021, the price of VNET ADSs dropped, triggering both provisions. *See id.* ¶¶ 8-9.  Around that time, Bold Ally notified Sheng Chen of his default on the Facility Agreement and that an "Early Termination" event had occurred.  *Id.* ¶ 12.

Separately, in early 2022, "VNET entered into hundreds of millions of dollars' worth of convertible debt and other financings which contained provisions requiring that Sheng Chen maintain his level of control within VNET . . . " (the "Financing Arrangements"). *Id.* ¶ 11. This included $250 million from funds managed by Blackstone Tactical Opportunities ("Blackstone"). *Id.* ¶ 45.  A Change of Control provision of the Blackstone Notes allowed Blackstone to redeem their convertible notes early if a "fundamental change" occurred. *Id.*  As specified in the Notes, one such fundamental change was if (1) "Sheng Chen 'ceases to be the largest holder of the Company's voting power represented by all voting securities of the Company," and (2) Sheng Chen "has resigned from the Board, or been removed from the Board by the Board or the Company's shareholders[.]" *Id.*  "[S]imilar clauses existed in other convertible bonds and domestic loans" with Citicorp International Limited ("Citicorp"). *Id.* ¶ 46; *see* Defs.' Mem. in Supp. of Mot. to Dismiss at 6 n.5 ("Defs.' Br."), ECF No. 37 (noting that "Plaintiffs do not cite the Citicorp Notes by name [in the Amended Complaint], but repeatedly reference them as part of

'VNET's $850 million outstanding convertible bonds and domestic loans.' (*See, e.g.*, AC ¶ 15.)").[2] Together, the notes "totaled over $850 million." Am. Compl. ¶ 46.

Plaintiffs allege that, as a consequence of the Change of Control provisions of VNET's Financing Arrangements, Sheng Chen's "Facility Agreement did not just impact Sheng Chen, but instead VNET as a whole, as it created a significant and destructive risk in the event that Sheng Chen ever defaulted on the loan." *Id.* ¶ 57. That is, Sheng Chen's default on the Facility Agreement threatened his controlling voting stake in VNET, thus increasing the risk of triggering the Change of Control provisions of VNET's Financing Agreements and exposing VNET to early redemption of more than $850 million worth of notes, which "threatened to shut down the entire Company." *See id.* ¶¶ 15, 57.

### B. Subsequent Developments and Defendants' Allegedly False and/or Misleading Disclosures

On March 31, 2022, VNET held its Fourth Quarter 2021 Earnings Call, during which Defendant Samuel Shen referenced the Blackstone Notes. *See id.* ¶ 67. There was no mention made, however, of the Change of Control Provision in the Notes, or of the fact that, under the terms of Sheng Chen's Facility Agreement with Bold Ally, Bold Ally "had the right to seize Sheng Chen's significant ownership stake in VNET. . . ." *Id.* ¶¶ 15, 69.

On April 6, 2022, Sheng Chen, his personal holding companies, and Bold Ally entered into an agreement known as the "Standstill Agreement." *Id.* ¶ 12. The Standstill Agreement, *inter alia*,

> (a) acknowledged that Sheng Chen was notified in November 2021 of his default of the Facility Agreement and the consequences resulting therefrom; (b) acknowledged that an Early Termination event had occurred in late 2021; [and] (c) arranged for the transfer of Sheng Chen's pledged shares into Restricted ADSs, so that after the passage of the

---

[2] On a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

> [requisite] restriction time under SEC Rule 144, Bold Ally could sell the ADS shares on the open market . . . .

*Id.*

On April 8, 2022, Sheng Chen filed a Form Schedule 13D acknowledging that he pledged all the VNET shares beneficially owned by him as collateral for the Facility Agreement. *See id.* ¶ 73.[3] But it "made no mention that both an Event of Default and an Early Termination event [under the Facility Agreement] had already occurred . . . ." *Id.* ¶ 14. It did, however, disclose and attach a redacted version of the August 2021 Facility Agreement. *Id.* ¶ 13. This redacted version of the Facility Agreement "replaced the actual trigger price of $8.50" per share set forth in the Early Termination Provision "with a series of asterisks." *Id.* Plaintiffs allege that, had the trigger price not been redacted from the document, investors could have "discover[ed] independently that an Early Termination event had already occurred . . . ." *Id.* Similarly, with respect to the Event of Default Provision, the definition of an "Event of Default" was replaced with a series of asterisks, concealing that this provision had also already been triggered. *Id.*

On April 26, 2022, VNET filed its annual report Form 20-F for the period ended December 31, 2021. *See id.* ¶ 81. The 2021 20-F described Sheng Chen's Facility Agreement with Bold Ally and noted that Sheng Chen had pledged his VNET shares as collateral, but it did not disclose that he was in default and that Bold Ally had the right to seize his shares. *See id.* ¶ 82.

**C. Drop in VNET Share Price**

A series of subsequent disclosures revealed the details of the Facility Agreement and Sheng Chen's default. First, "[o]n February 13, 2023, before the market opened, Bold Ally announced

---

[3] Paragraphs 73-80 of the Amended Complaint appear to erroneously refer to Sheng Chen's April 8, 2022 Form Schedule 13D as a Form Schedule 13G.

[that Sheng Chen was in default on the Facility Agreement and that] it would exercise its rights under the loan." *Id.* ¶¶ 16, 98.

> Then, on February 15, 2023, before the market opened, Defendants announced that they had taken action to replace the voting interests that Sheng Chen lost when his shares were seized by creating and authorizing the issuance of up to 555,000 newly created Class D ordinary shares to Sheng Chen that carried 500 times the voting power of Class A shares.

*Id.* ¶¶ 18, 102. Two days later, "on February 17, 2023, Sheng Chen filed with the United States Securities and Exchange Commission [an] amended Schedule 13D which acknowledged that VNET knew of the Facility Agreement," that he had been notified by Bold Ally several times that he was in default, and that Sheng Chen's VNET shares held through his personal holding company GenTao had been transferred to Bold Ally. *Id.* ¶¶ 20, 107.

The price of VNET ADSs dropped following each of these disclosures. "In total, from February 13, 2023, to February 21, 2023, VNET's ADS share price fell by $2.01, or 31.85%, in response to the disclosure of Sheng Chen's default, Bold Ally's seizure, and the newly created shares." *Id.* ¶¶ 21, 100, 106, 108-09.

## LEGAL STANDARDS

### A. Pleading Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In assessing the complaint, [a court] must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. However, the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

6

A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake." In concrete terms, this means that "a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). The PSLRA "expanded on the Rule 9(b) standard." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012). The PSLRA requires that a plaintiff "(1) specify each misleading statement, (2) set forth the facts on which a belief that a statement is misleading was formed, and (3) state with particularity facts giving rise to a strong inference that the defendant acted with scienter—the required state of mind." *Set Cap. LLC*, 996 F.3d at 75.

### B. Section 10(b)

"To state a cause of action under Section 10(b) . . . , a plaintiff must plead [1] that the defendant made a false statement or omitted a material fact, [2] with scienter, and [3] that plaintiff's reliance on defendant's action caused plaintiff injury." *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004). SEC Rule 10b-5 implements Section 10(b)'s prohibition on false or misleading statements and makes it unlawful for issuers of registered securities to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b) (2022). The Supreme Court "has found a right of action implied in the words of [§ 10(b) of the Exchange Act] and its implementing regulation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, Inc., 552 U.S. 148, 157 (2008).

## DISCUSSION

I.  **Section 10(b)**

Defendants argue that the Complaint fails to adequately plead any of the three elements of a 10(b) claim. The Court considers each in turn.

**A. False or Misleading Statement**

**1. Standard for a Material Misrepresentation**

To adequately allege a material misrepresentation, a plaintiff must allege particularized facts showing that the statement "was false at the time it was made." *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 230 (S.D.N.Y. 2023). The challenged misstatement must be both (1) false or misleading and (2) material. *See Leadersel Innotech ESG v. Teladoc Health, Inc.*, No. 23 Civ. 1112, 2024 WL 4274362, at *2 (2d Cir. Sept. 24, 2024) (citing *Singh v. Cigna Corp.*, 918 F.3d 57, 62-63 (2d Cir. 2019)).

    a.  False or Misleading

SEC Rule 10b-5 prohibits "two things": (1) "any untrue statement of a material fact—*i.e.*, false statements or lies," and (2) "omitting a material fact necessary to make the statements made . . . not misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263 (2024). With respect to the second category, "[SEC] Rule 10b-5(b) does not proscribe pure omissions," *id.* at 264—that is, "when a speaker says nothing, in circumstances that do not give any particular meaning to that silence," *id.* at 263. Rather, the Rule only "prohibits omitting material facts necessary to make the statements made . . . not misleading. Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete . . . ." *Id.* at 264; *see also Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 421 (S.D.N.Y.

2023) ("[A]lthough [SEC] Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a duty to be both accurate and complete.").

      b. Materiality

"The standard of materiality is whether the omitted fact 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Shapiro*, 652 F. Supp. 3d at 421 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

> [B]ecause of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

*In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015), *aff'd sub nom.*, *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014)).

    **2. Application**

Here, Plaintiffs allege that Defendants made multiple material misleading statements in March and April 2022, by referencing and describing the Facility Agreement between Sheng Chen and Bold Ally and the VNET Financing Arrangements with Blackstone and Citicorp, but redacting information to conceal "the fact that Sheng Chen had already defaulted on the Facility Agreement," thus "increasing the risk that Bold Ally would seize his shares and cause change in control provisions to be triggered" under the Financing Arrangements. Pls.' Opp'n at 7, ECF No. 39. In their memorandum of law in support of their motion to dismiss, Defendants raise two arguments.

First, citing the Supreme Court's recent decision in *Macquarie*, Defendants contend that "Plaintiffs' claims fail as a matter of law because they are based on an alleged failure to disclose, not on any affirmatively false or misleading statements." Defs.' Br. at 11. As noted, Defendants are correct that the Supreme Court made clear in *Macquarie* that "[SEC] Rule 10b-5(b) does not

9

proscribe pure omissions." 601 U.S. at 264. But that does not mean that a claim cannot be premised in part on the omission of information. Under *Macquarie*, "representations that state the truth only so far as it goes, while omitting critical qualifying information"—or "half-truths"—remain actionable under SEC Rule 10b-5. *Id.* at 263. SEC Rule 10b-5 "requires disclosure of information necessary to ensure that statements already made are *clear and complete*." *Id.* at 264 (emphasis added).

Here, it is not the case, as Defendants suggest, that "Plaintiffs' case is based on *pure* omissions." Defs.' Br. at 11 (emphasis added). Rather, Plaintiffs allege that "Defendants made affirmative statements about the Facility Agreement, VNET's financings, and the risks to VNET's ADSs, and did so in a deceptively incomplete fashion." Pls.' Opp'n at 8. This is perhaps most clear with respect to the April 2022 Schedule 13D, which attached a redacted version of Sheng Chen's Facility Agreement with Bold Ally, and from which was obscured: (1) the trigger price of $8.50 per share from the Early Termination Provision; and (2) the definition of an "Event of Default" from the Event of Default Provision. *See* Am. Compl. ¶¶ 13-14. While these redactions are technically "omissions," they are so precisely targeted to material information in the Facility Agreement as to render the filed documents misleading. "[A]lthough [SEC] Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a duty to be both accurate and complete." *Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 421 (S.D.N.Y. 2023). In essence, Defendants argue that they may publicize documents from which the most critical information is redacted, even if doing so creates a misleading impression about information that is material to investors. *Macquarie* does not support that proposition.

Second, Defendants argue that their statements were not misleading because, under the actual terms of the debt agreements with Blackstone and Citicorp, there was never a real risk of a

change of control of VNET. *See* Defs.' Br. at 12-15. For example, the Blackstone Notes provide for acceleration of the debt when two conditions are met: (1) Sheng Chen ceases to be the largest holder of voting power in VNET; and (2) he resigns from or is removed from the VNET Board. *See* Am. Compl. ¶ 45. Defendants note that neither condition ever actually occurred. Defs.' Br. at 13. And while Bold Ally may have had the right to seize Sheng Chen's VNET shares, "Plaintiffs do not allege that Mr. Chen ever . . . was at risk of resigning or being removed" from the VNET Board. *Id.* Thus, according to Defendants, Sheng Chen's default on the "Facility Agreement ha[d] no bearing on VNET's Blackstone Notes and Citicorp Notes," because even if Bold Ally seized his VNET shares, there was never a risk of the second condition for acceleration of the Blackstone and Citicorp Notes (i.e., Sheng Chen's removal or resignation from the Board). *Id.* at 15. Thus, Defendants contend, their alleged concealment of Sheng Chen's default was immaterial.

The Court does not agree. Plaintiffs have alleged that, as a result of Sheng Chen's default on the Facility Agreement, Bold Ally had the right to seize his VNET holdings. *See* Am. Compl. ¶¶ 8-12. Plaintiffs have therefore alleged that there was a possibility that Sheng Chen would cease to be the largest holder of VNET voting power. Defendants do not meaningfully dispute that this risk had materialized. *Cf. In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized."). Moreover, Defendants' characterization of this as having "no bearing on VNET's Blackstone Notes and Citicorp Notes" is an overstatement, because if Sheng Chen ceased to be the largest holder of voting power in VNET, that would trigger one of the two conditions for acceleration of VNET's very large debts with Blackstone and Citicorp, creating an increased risk to VNET's ability to continue to operate. And once this risk became public, VNET's share price dropped precipitously.

11

*See* Am. Compl. ¶¶ 16-21, 98-111. The fact that, ultimately, a change in control never came to pass does not mean that Plaintiffs have failed to state a claim with respect to Defendants' concealment of the risk of triggering one of the conditions for such a change in control. *Cf. In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 315 (S.D.N.Y. 2013) (denying motion to dismiss where defendants' "disclosures did not specifically reveal the particular risks allegedly known to [them]"). Accordingly, the Court concludes that Plaintiffs have adequately alleged misleading material statements.[4]

### B. Scienter

#### 1. Standard for Scienter

"[A] complaint must, with respect to each defendant and with respect to each act or omission alleged to constitute securities fraud, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Bristol-Myers*, 658 F. Supp. 3d at 230; *see also* 15 U.S.C. § 78u-4(b)(2). Scienter can be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (describing pre-PSLRA standard for scienter in the Second Circuit and noting that the PSLRA "did not change the basic pleading standard for scienter in this circuit"). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the

---

[4] Defendants also take issue with various other statements that Plaintiffs allege are misleading. *See, e.g.*, Defs.' Br. at 15-16 (arguing that "[t]here is nothing remotely false or misleading about" statements made by CFO Tim Chen and CEO Samuel Shen regarding "VNET's financing goals" during the "fourth quarter 2021 earnings announcements on March 30, 2022"). However, because the Court concludes that Plaintiffs have alleged at least some actionable materially misleading misstatements sufficient to establish the first element of a Section 10(b) claim, it does not address the other arguments raised by Defendants.

facts alleged.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (alterations in original) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).

### 2. Application

Here, Plaintiffs allege the Defendants had actual notice of Sheng Chen's default on the Facility Agreement. *See* Am. Compl. ¶¶ 50-61, 70-71, 86, 107, 112-17, 131-34. Sheng Chen—who was party to the Facility Agreement—was notified several times by Bold Ally of his breach. *See, e.g.*, *id.* ¶¶ 20, 86, 107, 112-17. Defendants were also aware of the terms of VNET's Financing Arrangements with Blackstone and Citicorp. *See, e.g.*, *id.* ¶¶ 132-34. And Plaintiffs have alleged that Defendants redacted the precise information that would have enabled investors to realize that Sheng Chen's default had occurred. *See id.* ¶¶ 13-14. "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).

Defendants raise three arguments in response. First, they contend that their knowledge of Sheng Chen's default on the Facility Agreement cannot give rise to an inference of scienter because they had no duty to disclose this fact in the first place. *See* Defs.' Br. at 23. This is, in essence, a repackaging of their argument that omissions cannot form the basis for liability under Section 10(b). But because the Court concludes that Defendants' failures to fully disclose the terms of the Agreement were material misrepresentations, Defendants knowledge of that information (which they do not deny) constitutes a basis to infer scienter.

Next, Defendants argue that Plaintiffs have failed to allege that Defendants actually believed that Sheng Chen's default on the Facility Agreement created a risk of triggering the change of control provisions in the Blackstone or Citicorp Notes. *See id.* This, too, is essentially a repackaging of an argument raised by Defendants on the material misrepresentation element (i.e., that there was no real risk of the Blackstone and Citicorp debts being accelerated), which the Court also rejects for the reasons stated above. As noted *supra*, Sheng Chen's default created the very real risk that one of the two conditions for acceleration of the Blackstone and Citicorp debts would occur. Defendants' misrepresentations about Sheng Chen's default, and thus Defendants' knowledge of the default, is a basis to infer scienter.

Finally, Defendants assert, with respect to the Individual Defendants aside from Sheng Chen, that their roles as high-level executives responsible for VNET's "core operations" are not, by themselves, a basis to infer scienter. *See id.* But that is not what Plaintiffs have alleged—rather it is that Defendants, by virtue of the respective roles, had access to specific information (i.e., the terms of the Facility Agreement and the Financing Arrangements), that was redacted from public statements, rendering those statements misleading. *See In re Aphria, Inc. Sec. Litig.*, No. 18 Civ. 11376, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020), *reconsideration denied*, 2021 WL 4442818 (S.D.N.Y. Sept. 28, 2021) (holding that scienter was established where CEO and CFO had access to information that contradicted their public statements). That is sufficient for scienter.[5]

---

[5] Because the Court concludes that Plaintiffs have adequately alleged scienter on the basis of the access to and notice of concealed information, it does not address the parties' arguments regarding an alternative basis for inferring scienter based on evidence of a motive to defraud. *See* Defs.' Br. at 22; Pls.' Opp'n at 19.

### C. Loss Causation

#### 1. Standard for Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). "[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id*. at 173. Loss causation is adequately pled where a plaintiff alleges either "(a) . . . that the market reacted negatively to a corrective disclosure of the fraud; or (b) that that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters*, 750 F.3d at 232-33. The Second Circuit has not decided whether Rule 9(b)'s heightened pleading standard applies to loss causation, *see Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 n.65 (2d Cir. 2020), but it has stated that "Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

#### 2. Application

Here, Plaintiffs allege that three disclosures in February 2023 revealed Sheng Chen's default on the Facility Agreement and its potential impact on VNET: (1) the disclosure on February 13, 2023, of Sheng Chen's default and Bold Ally's initial seizure of shares; (2) the February 15, 2023, issuance of new shares to Sheng Chen, which revealed the magnitude of the threat to his control of VNET; and (3) the February 17, 2023, disclosure that Sheng Chen had been notified

15

multiple times of his default, which had not been disclosed previously to investors. *See* Am. Compl. ¶¶ 98, 102, 107. Each of these revelations was accompanied by a decline in VNET's share price. *See id.* ¶¶ 100, 106, 108-09. "[I]f a plaintiff relies upon a particular disclosure as the basis for his loss causation allegations, that disclosure must somehow reveal to the market some part of the truth regarding the alleged fraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008). Here, the disclosures identified by Plaintiffs revealed to the market some part of the truth regarding the risk to VNET caused by Sheng Chen's default, and Plaintiffs allege that the market responded accordingly.

Defendants' lone counterargument is that these disclosures did not constitute revelations of previously-concealed information, but rather "new developments," which cannot form the basis for loss causation. Defs.' Br. at 24-25. But that is not correct. The fact of Sheng Chen's default, Bold Ally's entitlement to seize his shares, and the risk that this posed to VNET under the Financing Arrangements were not "new developments" in February 2023. True, the fact that these dangers had more fully matured, with Bold Ally now making an initial seizure of Sheng Chen's collateral, was a new development—but the publication of that event revealed existing facts that had been misleadingly concealed until that point.

## II. Remaining Issues

### A. Scheme Liability

To state a claim for scheme liability under SEC Rule 10b-5, Plaintiffs must plead that Defendants "(1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter." *Sec. & Exch. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 319 (S.D.N.Y. 2019) (quoting *Sec. & Exch. Comm'n v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (citations omitted)). A "manipulative or deceptive" act is "some act that gives the

16

victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008). But "misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections." *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005)). Plaintiffs must "clearly identify any deceptive acts distinct from the alleged . . . misstatements and omissions." *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22 Civ. 355, 2024 WL 2890968, at *5 n.5 (2d Cir. June 10, 2024).

Defendants argue that Plaintiffs' scheme liability claim should be dismissed because it is duplicative of their Section 10(b) claim. *See* Defs.' Br. at 25. The Court agrees. Although Plaintiffs argue that their scheme liability claim is distinct because it is premised on "[m]anipulating paperwork" in the form of deceptive redactions to the Facility Agreement, Pls.' Opp'n at 23, these redactions are (part of) the basis on which the Court determined that Plaintiffs have stated a claim under Section 10(b). Accordingly, Plaintiffs' scheme liability claims are dismissed a duplicative.

### B. Control Person Liability

Finally, Defendants argue that Plaintiffs' control person claims under Section 20(a) must be dismissed on the grounds that Plaintiffs have failed to plead a Section 10(b) claim, which is a prerequisite to a successful claim under Section 20(a). *See* Defs.' Br. at 25. Because the Court rejects Defendants' arguments with respect to Plaintiffs Section 10(b) claim, this argument fails.

## CONCLUSION

For the reasons given above, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion is granted as to Plaintiffs' scheme liability claim and denied in all other respects.

An order scheduling an Initial Pretrial Conference in this matter shall issue separately. The Clerk of Court is respectfully directed to close the motions at ECF. No. 36.

SO ORDERED.

Dated: September 15, 2025
New York, New York

DALE E. HO
United States District Judge