**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE VNET GROUP, INC. SECURITIES LITIGATION | Case No. 1:23-cv-11187-DEH |
| | **CLASS ACTION** |
| | Honorable Dale E. Ho |

**ORDER GRANTING PLAINTIFFS' WONG TAN AND MICHAEL SEMERAK MOTION FOR THE ISSUANCE OF LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE**

This matter having arisen upon motion by Lead Plaintiff Wong Tan ("Lead Plaintiff") and Additional Plaintiff, Michael Semerak (collectively, "Plaintiffs") for this Court to issue the Request for International Assistance – Letter of Request (the "Letter of Request") to the Central Authority of the Cayman Islands, and it appearing that the Letter of Request is appropriate.

IT IS ORDERED, that this Court shall issue the Letter of Request in the form attached as Exhibit A to the Declaration of Christopher Tourek, and affix the seal of the United States District Court for the Southern District of New York over its signature in the Letter of Request.

Dated: December 22, 2025          By: _____

                                            Dale E. Ho
                                     United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE VNET GROUP, INC. SECURITIES LITIGATION | Case No. 1:23-cv-11187-DEH<br><br>**<u>CLASS ACTION</u>**<br><br>Honorable Dale E. Ho |

## <u>REQUEST FOR INTERNATIONAL ASSISTANCE – LETTER OF REQUEST</u>

The United States District Court for the Southern District of New York respectfully requests international judicial assistance to obtain discovery evidence from a non-party to this action located in the Cayman Islands to be used in a civil action before this Court ("Letter of Request"). This Letter of Request is made pursuant to, and in conformity with the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, to which both the United States and the United Kingdom are signatories.

Based on the representations made by Lead Plaintiff Wong Tan ("Lead Plaintiff") and Additional Plaintiff, Michael Semerak (collectively, "Plaintiffs"), this Court finds that there are sufficient grounds to obtain documentary evidence from non-party Bold Ally (Cayman) Limited ("Bold Ally"), c/o Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands, in the above captioned action and that such evidence should be produced in the interest of justice. Based on the information presented to the Court by Plaintiffs, this Court finds that the documentary evidence sought through this Letter of Request is likely to

1

be relevant to Plaintiffs' claims and is not pre-trial discovery within the meaning of the declaration

made by the Cayman Islands regarding Article 23 of the Hague Convention.

The particulars of this Letter of Request are as follows:

| 1. | **Sender** | Joshua B. Silverman<br>Christopher P.T. Tourek<br>Pomerantz LLP<br>10 South LaSalle, Suite 3505<br>Chicago, Illinois 60603<br>Telephone: (312) 377-1181<br>Email: jbsilverman@pomlaw.com<br>ctourek@pomlaw.com<br><br>Gregory B. Linkh<br>Glancy Prongay & Murray LLP<br>230 Park Ave, Suite 358<br>New York, New York 10169<br>Telephone: (212) 682-5340<br>Facsimile: (212) 884-0988<br>Email: glinkh@glancylaw.com |
| 2. | **Central Authority of Requested State** | The Clerk of the Courts<br>Grand Court<br>Cayman Islands |
| 3. | **Person to whom the executed request is to be returned** | Joshua B. Silverman<br>Christopher P.T. Tourek<br>Jianan Jiang<br>Pomerantz LLP<br>10 South LaSalle, Suite 3505<br>Chicago, Illinois 60603<br>Telephone: (312) 377-1181<br>Email: jbsilverman@pomlaw.com<br>ctourek@pomlaw.com<br>ajiang@pomlaw.com |

4.    **Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request**

2

The requesting authority respectfully requests that a response to the Letter of Request be provided as soon as practicable in order to ensure that evidence may be obtained before the deadline for the completion of discovery in this action, which is October 16, 2026.

In conformity with Article 3 of the Convention, the undersigned applicant has the honor to submit the following request:

| | | |
|---|---|---|
| **5.a** | **The Requesting Judicial Authority** | The Honorable Dale E. Ho<br>United States District Court Judge<br>U.S. District Court for the Southern District of New York<br>Thurgood Marshall<br>United States Courthouse<br>40 Foley Square<br>New York, NY 10007<br>United States of America |
| **5.b** | **To the Competent Authority of the Cayman Islands** | The Clerk of the Courts<br>Grand Court<br>P.O. Box 495<br>61 Edward Street<br>George Town, Grand Cayman<br>Cayman Islands |
| **5.c** | **Names of the Case and Identifying Docket Number** | *In Re VNET Group, Inc. Securities Litigation*<br>Case No. 1:23-cv-11187-DEH<br>United States District Court for the Southern District of New York |
| **6.** | **Names and Addresses of the Parties and their Representatives** | |
| **6.a** | **Plaintiffs (Complainants)** | Wong Tan<br>c/o Christopher P.T. Tourek<br>Pomerantz LLP<br>10 South LaSalle, Suite 3505<br>Chicago, Illinois 60603<br>Telephone: (312) 377-1181<br>Email: ctourek@pomlaw.com<br><br>Michael Semerak<br>c/o Gregory B. Linkh |

Glancy Prongay & Murray LLP
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

**Plaintiffs' Representatives**          **Pomerantz LLP**
Joshua B. Silverman
Christopher P.T. Tourek
Jianan Jiang
Pomerantz LLP
10 South LaSalle, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Email: jbsilverman@pomlaw.com
    ctourek@pomlaw.com
    ajiang@pomlaw.com

Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Email: jalieberman@pomlaw.com

**Glancy Prongay & Murray LLP**
Gregory B. Linkh
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com
    rdawson@glancylaw.com

**HAO LAW FIRM**
Junbo Hao
Room 3-401 No. 2 Building
No. 1 Shuangliubei Street
100024 Beijing People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

**6.b    Defendants**          VNET Group, Inc.
c/o Michael C. Griffin
Skadden, Arps, Slate, Meagher & Flom LLP

4

One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
michael.griffin@skadden.com

Josh Sheng Chen
c/o Michael C. Griffin
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
michael.griffin@skadden.com

Jie Dong
c/o Michael C. Griffin
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
michael.griffin@skadden.com

Samuel Shen
c/o Michael C. Griffin
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
michael.griffin@skadden.com

Tim Chen
c/o Michael C. Griffin
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
michael.griffin@skadden.com

| **Defendants' Representatives** | **Skadden, Arps, Slate, Meagher & Flom LLP**<br>Scott D. Musoff<br>Robert A. Fumerton |

5

Michael C. Griffin
Thomas F. Allen
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com
thomas.allen@skadden.com

**7.a    Nature of the Proceedings**

This is a civil securities class action arising from allegations that Defendants made false and misleading statements, and omitted material information necessary to make those statements not false or misleading, in Defendants' Schedule 13Ds, Form 6-K, and Form 20-F disclosures filed with the U.S. Securities and Exchange Commission ("SEC") and various statements made by Defendants during the Class Period. The alleged misstatements pertain to Josh Sheng Chen's loan with Bold Ally and its impact on VNET.

Plaintiffs Wong Tan and Michael Semerak, and the putative class of investors they seek to represent, allegedly (i) purchased or otherwise acquired public shares in VNET during the Class Period (from March 30, 2022 to February 17, 2023, both dates inclusive), and (ii) suffered significant losses and damages as a result of Defendants' alleged misstatements.

Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) were upheld at the pleading stage by the Honorable Dale E. Ho of the United States District Court for the Southern District of New York.[1] However, these claims must still be proved at trial.

---

[1] A copy of the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss the Complaint (the "Order"), dated September 15, 2025, is attached as Attachment 3 to this Request. The Court granted Defendants' Motion to Dismiss as to Plaintiffs' scheme liability claim, which was held to be duplicative of Plaintiffs' claims under Section 10(b) of the Securities

6

A copy of Plaintiffs' First Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), dated May 20, 2024, is attached as Attachment 2 to this Request.[2] The nature of the action is summarized at Complaint ¶¶1–22. Plaintiffs seek damages and other relief for injury caused by Defendants' alleged wrongdoing.

**7.b      Summary of the Complaint[3]**

VNET is an internet and data center service provider, founded by Defendant Josh Sheng Chen ("Sheng Chen"), that operates throughout China. ¶¶36–43. The Company provides hosting and related services, including data center services, cloud services, and virtual private network ("VPN") services. *Id.* In addition to VNET, Sheng Chen also founded multiple personal holding companies of which he is the sole owner and operator, including GenTao Capital Limited ("GenTao"), Fast Horse Technology Limited ("Fast Horse"), Sunrise Corporate Holding Ltd. ("Sunrise"), Personal Group Limited ("Personal Group"), and Beacon Capital Group Inc. ("Beacon"). ¶¶48–49. On August 19, 2021, Sheng Chen, through GenTao, entered into a Facility Agreement to obtain a $50.25 million loan from Bold Ally (Cayman) Limited ("Bold Ally"). ¶¶50–57. Shortly after Sheng Chen entered into the Facility Agreement, VNET entered into an acknowledgement letter with Bold Ally, providing VNET with access to all of the terms of the Facility Agreement. ¶¶131–33.

---

Exchange Act of 1934. The Court denied Defendants' Motion to Dismiss as to Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934.

[2] All "¶__" references are to the First Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF 34).

[3] This section provides a high-level summary of the claims asserted by Plaintiffs that the Court sustained in the Order. These claims have not been proven, and Defendants reserve all rights and defenses with respect to the claims asserted. Moreover, this summary is not intended to be a comprehensive description of the claims that Plaintiffs may raise.

Under the Facility Agreement, Sheng Chen personally guaranteed the loan and pledged all of his shares in VNET and those held by his personal holding companies as collateral. ¶¶50–57. The Facility Agreement contained an "Early Termination Provision" and an "Event of Default" clause. ¶¶55–56. Plaintiffs allege the Early Termination Provision stated that if VNET's securities' share price fell below $8.50 for two consecutive trading days, Bold Ally could cancel the loan and demand full payment within 10 business days. *Id*. Plaintiffs further allege the Facility Agreement contained an Event of Default if the value of certain pledged shares fell below $63,000,000, which would occur if the ADS share price dropped below approximately $11.80. *Id.*

On January 28, 2022, VNET raised $250 million from funds managed by Blackstone, Inc. through the sale of convertible notes which had a term of five years and carried interest at 2% per annum. ¶45. In the convertible notes sales document was a clause that allowed Blackstone to redeem their convertible notes early if a "fundamental change" occurred. *Id*. One fundamental change specified in the sales agreement was if Sheng Chen "ceases to be the largest holder of the Company's voting power represented by all voting securities of the Company" and has resigned or been removed from the board. *Id.* VNET also borrowed more than $850 million through convertible bonds and domestic loans with change-of-control clauses. ¶46. Therefore, Sheng Chen's default under the Facility Agreement would pose an existential threat to the Company. *Id.*

Plaintiffs allege that almost immediately after Sheng Chen entered into the Facility Agreement, he defaulted on it, and that Defendants were informed of Sheng Chen's default. ¶¶58–61. Bold Ally would inform Defendants of Sheng Chen's ongoing default of the Facility Agreement at least five times during the Class Period. ¶107.

Plaintiffs allege that on March 30, 2022, Defendants made a number of statements about VNET's financial health, but omitted the significant risk posed by Sheng Chen's ongoing default

of the Facility Agreement. ¶¶64–66. On March 31, 2022, Sheng Chen discussed the Facility Agreement with investors during VNET's Fourth Quarter 2021 Earnings Call, but again omitted that he was in default of the Facility Agreement or the risk that his default posed to VNET. ¶¶67–69. On April 8, 2022, Sheng Chen filed a version of the Facility Agreement in a Schedule 13D with the SEC that Plaintiffs allege was doctored. ¶¶73–80. Plaintiffs allege that this filing obscured the "Early Termination Event" actual trigger price of $8.50 by replacing it with a series of asterisks: "US$*****". *Id.* Plaintiffs further allege that Sheng Chen similarly obscured the entire "Event of Default" clause by replacing its text with asterisks. *Id.* Plaintiffs allege that Defendants continued to discuss the Facility Agreement, the health of VNET, and VNET's future plans throughout 2022 without ever disclosing Sheng Chen's default of the facility agreement and the risks it posed to VNET. ¶¶81–97.

On February 13, 2023, Bold Ally announced that GenTao had defaulted and Bold Ally would enforce the terms of the Facility Agreement. ¶98. Subsequently, on February 15, 2023, VNET Board of Directors approved the creation of 555,000 new Class D shares, which would be entitled to 500 votes per share, and authorized the issuance of these Class D shares to Sheng Chen without shareholder approval or advance notice. ¶¶102–03. Also, the Class B shares seized by Bold Ally had 10 times the voting power of the Class A shares. ¶104. On February 17, 2023, Sheng Chen acknowledged that he had been notified five times during the Class Period of the default and GenTao's shares were transferred to Bold Ally. ¶107.

From February 13, 2023 to February 21, 2023, in response to these announcements, VNET's share price fell by $2.01, or 31.85%. ¶109.

**8.a    Evidence to be Obtained**

The undersigned applicant is honored to request that in the interest of justice and for the purpose of obtaining evidence in a judicial proceeding now being litigated before the Requesting Court and for the due determination of the matters in dispute between the parties hereto, that the appropriate judicial authority of the Cayman Islands direct, through competent authority by your usual and proper process, summons to Bold Ally (Cayman) Limited c/o Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands to provide documents and reports to be examined, and produce documentary evidence related to this litigation for use at trial.

**8.b     Purpose of the Evidence or Judicial Act Sought**

The requested documents will provide important evidence regarding Josh Sheng Chen's loan with Bold Ally and its impact on VNET. Accordingly, this Court finds that the interests of justice require Bold Ally to produce the documents referenced in Attachment 1 to this Request.

In addition, because Bold Ally is not a party to this action, Plaintiffs may only obtain its documents through a Letter of Request.

**9.     Documents or Other Property to be Inspected**

*See* Attachment 1 of this Request.

**10.    Special Methods or Procedure to be Followed**

In the event that any document called for by these requests is withheld in whole or in part on the basis of any applicable privilege, it is requested that Bold Ally furnish a privilege log that identifies each document for which any privilege is claimed and that provides, with respect to each document, the following information:

a.     The place, date, and manner of recording or otherwise preparing the document;

b.     The name and title of the sender;

10

c.      The identity of each person or persons (other than clerical assistants) participating in the preparation of the document;

d.      The identity of each person to whom the contents of the document have heretofore been communicated by copy, exhibition, sketch, reading or substantial summarization, the dates of said communication, and the employer and title of said person at the time of said communication;

e.      Type of document;

f.      Subject matter (without revealing the relevant information for which privilege or statutory authority is claimed); and

g.      Factual and legal basis for claim, privilege, or specific statutory or regulatory authority that provides the claimed ground for non-production.

**11.     Request for Notification of the Time and Place for the Execution of the Request and Identify and Address of any Person to be Notified**

It is requested that the individuals identified below be furnished as soon as practicable with a copy of the executed Letter of Request:

Joshua B. Silverman
Christopher P.T. Tourek
Pomerantz LLP
10 South LaSalle, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Email: jbsilverman@pomlaw.com
      ctourek@pomlaw.com

Counsel for Plaintiffs will promptly send notice to counsel for all parties to this action.

**12.     Request for Attendance or Participation of Judicial Personnel of the Requesting Authority at the Execution of the Letter of Request**

None.

**13.     Specification of Privilege or Duty to Refuse to Produce Documents Under Law of the State of Origin**

Neither this Request for International Judicial Assistance nor the transmission of documents pursuant to the Hague Convention shall waive, or be deemed or argued to have waived, the attorney-client privilege, the work product doctrine, or any other privileges, rights, protections, or prohibitions that may apply to that evidence under the laws of the Cayman Islands, the United States, or the State of New York, including the privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

**14.     The Fees and Costs Incurred Which are Reimbursable Under the Second Paragraph of Article 14 or under Article 26 of the Convention**

Fees and costs incurred which are reimbursable under the Hague Convention shall be borne by Plaintiffs. The payment of any such fees and costs is without prejudice to Plaintiffs' rights to make subsequent requests for reimbursement of those fees and costs from other parties to the proceedings before the Requesting Court.

**15.     Closing**

In the furtherance of justice and by the proper and usual process of this court, the United States District Court for the Southern District of New York assures the appropriate judicial authority in the Cayman Islands that it is willing to provide similar cooperation and assistance to the judicial authorities of the Cayman Islands in the event that the Cayman Islands requests similar assistance. We respectfully request that the requesting party provide copies of the documents produced to the parties' representative as identified in Section 6 above and to:

The Honorable Dale E. Ho
United States District Court Judge
U.S. District Court for the Southern District
of New York
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

12

Honorable Dale E. Ho, United States District Court Judge of the United States District Court

for the Southern District of New York and the seal thereof, this    22 day of December, 2025.


SIGNATURE AND SEAL OF THE
REQUESTING AUTHORITY

THE HONORABLE DALE E. HO
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

Attachments:

| | |
|---|---|
| Attachment 1 | Documents to be Produced by Bold Ally (Cayman) Limited |
| Attachment 2 | Amended Complaint |
| Attachment 3 | Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss the Amended Complaint |

13

**ATTACHMENT 1**

## I.    DEFINITIONS

1.    "Communication" or "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), including, without limitation, emails, instant messages on any platform (including ephemeral platforms such as WeChat, WhatsApp, Signal, or Telegram), texts, and physical communications.

2.    "Concerning," "regarding," "refer," "referring," "relating," or "related," means mentioning, explicitly or implicitly describing or discussing (in part or in whole), reflecting upon, recording, memorializing, evaluating, or constituting.

3.    "Defendants" means VNET, Josh Sheng Chen ("Sheng Chen"), Jie Dong ("Dong"), Samuel Shen ("Shen"), and Tim Chen ("Chen").

4.    "Document" or "Documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate Document within the meaning of this term.

5.    "Facility Agreement" refers to the facility agreement between Sheng Chen, through GenTao, and Bold Ally entered into on August 19, 2021, providing Sheng Chen with a $50.25 million loan.

6.    "Standstill Agreement" refers to the agreement between Sheng Chen and Bold Ally entered into on April 6, 2022 which: (a) acknowledged that Sheng Chen was notified in November 2021 of his default of the Facility Agreement and the consequences resulting therefrom; (b) acknowledged that an Early Termination event had occurred in late 2021; (c) arranged for the transfer of Sheng Chen's pledged shares into Restricted ADSs, so that after the passage of the restriction time under SEC Rule 144, Boldy Ally could sell the ADS shares on the open market;

and (d) provided that Bold Ally would not take certain further other actions as a result of the default and Early Termination event.

7.   "VNET" means Defendant VNET Group, Inc., and its subsidiaries, divisions, subdivision practice groups, departments, affiliates, successors and joint ventures, and present and former officers, directors, partners, principals, employees, representatives, agents, attorneys, advisors, and all other individuals acting or understood to act on its behalf.

8.   "You" means Bold Ally (Cayman) Limited, and its subsidiaries, divisions, subdivision practice groups, departments, affiliates, successors and joint ventures, and present and former officers, directors, partners, principals, employees, representatives, agents, attorneys, advisors, and all other individuals acting or understood to act on its behalf.

## II.   GENERAL INSTRUCTIONS

1.   None of the Instructions contained herein shall be construed to in any way abrogate or limit Your obligations under the rules set forth in the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters dated March 18, 1970 or any other privileges, rights, protections, or prohibitions that may apply to that evidence under the laws of the Cayman Islands.

2.   These Requests are continuing in nature and require that You timely supplement any production whenever You acquire or locate additional Documents between the time of these Requests and the final resolution of this Action.

3.   In producing Documents, You are to furnish all Documents in Your possession, custody, or control.

4.   Each Document requested shall be produced in its entirety. If a Document responsive to any Request cannot be produced in full, it shall be produced to the extent possible.

5.    If any responsive Document has been lost, destroyed, removed from, or is no longer in Your possession, custody, or control for any reason, please identify as such in Your response.

6.    Each request should be responded to separately. However, a document responsive to more than one request may, if the relevant portion is marked or indexed, be produced and referred to in a later response.

7.    To the extent You object to any portion of any Request, You shall set forth all reasons for your objection and furnish Documents responsive to the remainder of the Request. If Documents are withheld on the basis of an objection, You shall state that responsive materials are being withheld on the basis of that objection.

8.    The defined terms in the above "DEFINITIONS" section apply throughout this document. Any undefined term shall be interpreted in accordance with its ordinary meaning.

## III.    RELEVANT TIME PERIOD

Unless otherwise indicated, the time period covered by these Requests for Production of Documents covers the period from January 1, 2021 to December 31, 2023, inclusive (the "Relevant Time Period"), and shall include events or circumstances that occurred during such period. However, if events or circumstances occurring prior to January 1, 2021 are necessary for a correct or complete understanding of Your response to any of these Requests for Production of Documents, such events or circumstances should be deemed relevant and responsive thereto.

## IV.    REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    Any contracts between You and Josh Sheng Chen or VNET.

2.    Any Communications or other Documents sent by You or received by You Concerning the Facility Agreement (including but not limited to any default thereof), the Standstill Agreement, or the potential seizure of Josh Sheng Chen's VNET shares.

3. Documents sufficient to identify all meetings, virtual meetings, phone calls, or other oral Communications between You and Josh Sheng Chen or VNET.

4. Any Documents You filed with any court, government agency, or other governmental entity Concerning Josh Sheng Chen, the Facility Agreement (including but not limited to any default thereof), or the Standstill Agreement.

**ATTACHMENT 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE VNET GROUP, INC. SECURITIES LITIGATION | Case No. 1:23-cv-11187-DEH<br><br>**CLASS ACTION**<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Honorable Dale E. Ho<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiff Wong Tan ("Lead Plaintiff") and Additional Plaintiff, Michael Semerak (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings, press releases, earnings presentations, conference call transcripts, and other information prepared for investors by VNET Group, Inc. ("VNET" or the "Company"), as well as media and analyst reports about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired VNET American depositary shares ("ADSs" or "VNET securities") between March 23,

1

2022, and February 17, 2023 inclusive (the "Class Period").[1] Plaintiffs pursue claims against the Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. VNET is an internet and data center service provider which operates throughout China. The Company provides hosting and related services, including data center services, cloud services, and virtual private network ("VPN") services through which customers can connect to the internet in China. VNET is a holding company with operations primarily conducted by its subsidiaries and variable interest entities and their subsidiaries.

3. The Company was founded by Defendant Josh Sheng Chen ("Sheng Chen"). In addition to VNET, Sheng Chen also founded multiple personal holding companies of which he is the sole owner and operator, including GenTao Capital Limited ("GenTao"), Fast Horse Technology Limited ("Fast Horse"), Sunrise Corporation Holding Ltd. ("Sunrise"), Personal Group Limited ("Personal Group"), and Beacon Capital Group Inc. ("Beacon").

4. VNET (formerly known as 21Vianet, Inc.) went public in 2011, offering ADSs, each of which represent six of its Class A ordinary shares on the Nasdaq Global Select Market ("NASDAQ").[2]

5. Between going public and the beginning of the Class Period, Sheng Chen retained a significant stake in VNET (both directly and through his personal holding companies), controlled its Board of Directors for which he served as Executive Chairman, and maintained substantial voting power. For example, in 2021, GenTao held 48,515,635 Class A ordinary shares in VNET; Fast Horse

---

[1] ADSs are shares in foreign companies held by U.S. depositary banks and traded on major U.S. exchanges like any domestic stock.

[2] Share "classes", *e.g.*, Class A/B/C/D shares, etc., are a way of assigning different rights to different stockholders. They can address issues such as voting authority, dividends and rights to a company's assets and capital.

held 19,670,117 Class B ordinary shares in VNET; Sunrise held 8,087,875 Class B ordinary shares in VNET; and Personal Group held four Class A ordinary shares, 769,486 Class B ordinary shares and 60,000 Class C ordinary shares in VNET. Just prior to the Class Period, Sheng Chen owned approximately 8.8% of total outstanding ordinary shares but had approximately 28.6% of the aggregate voting power due to his ownership of supra-voting share classes.

6. On August 19, 2021, Sheng Chen – through GenTao – entered into a Facility Agreement to obtain a $50.25 million loan from a company called Bold Ally (Cayman) Limited ("Bold Ally"). Under the Facility Agreement, which was known to VNET and its senior executives at all relevant times, Sheng Chen personally guaranteed the loan and pledged all of his shares in VNET and those held by his personal holding companies as collateral, which consisted of approximately 78.52 million Class A, Class B, and Class C shares as of February 28, 2022.

7. The Facility Agreement had an early termination clause which stated that if VNET's securities' share price fell below a certain price for two (2) consecutive business days, Bold Ally could cancel the loan and demand full payment on the loan within ten (10) business days (the "Early Termination Provision"). The Facility Agreement also contained a provision under which it would be an event of default if a calculation of certain pledged Class A shares fell below a threshold of $63,000,000, which would occur if the ADS share price dropped below approximately $11.80 (an "Event of Default"). As part of Sheng Chen's loan facility, VNET entered into an "Issuer Acknowledgment Letter" with Bold Ally, "pursuant to which the parties have agreed to, among other things, take specified administrative actions in connection with any transfer of Class A Ordinary Shares or Class B Ordinary Shares by the Lender upon an exercise of remedies under the Facility Documentation."[3]

---

[3] *See* sec.gov/Archives/edgar/data/1541680/000110465923023288/tm236084d1_sc13da.htm.

Case 1:23-cv-11187-HD Document 63 Filed 07/28/25 Page 24 of 96

8. In November and December 2021, the price of VNET ADSs dropped precipitously:



9. This caused both the Early Termination Provision and the Event of Default provisions in the Facility Agreement to trigger.

10. On November 22, 2021, Bold Ally notified Gen Tao and Sheng Chen that its margin under the Facility Agreement was deficient and asked for more collateral to be deposited. According to a subsequent standstill letter acknowledged by Sheng Chen, *see* ¶12, below, that margin request was not satisfied. As a result, Sheng Chen and Gen Tao remained in default of the Facility Agreement throughout the Class Period, which Defendants hid from investors.

11. Exacerbating the grave problems caused by the concealed default, in early 2022, VNET entered into hundreds of millions of dollars' worth of convertible debt and other financings which contained provisions requiring that Sheng Chen maintain his level of control within VNET ("Change of Control clauses"). When these financings were disclosed to investors, Defendants concealed that Sheng Chen's holdings were already in peril because of his then-existing breaches of Facility Agreement covenants which allowed Bold Ally to seize his shares. This known, actual risk was not disclosed to investors.

12. On April 6, 2022, Sheng Chen, his personal holding companies, and Bold Ally entered

4

into a standstill agreement which: (a) acknowledged that Sheng Chen was notified in November 2021 of his default of the Facility Agreement and the consequences resulting therefrom; (b) acknowledged that an Early Termination event had occurred in late 2021; (c) arranged for the transfer of Sheng Chen's pledged shares into Restricted ADSs, so that after the passage of the restriction time under SEC Rule 144, Boldy Ally could sell the ADS shares on the open market; and (d) provided that Bold Ally would not take certain further other actions as a result of the default and Early Termination event. Neither the standstill agreement nor its conditions were disclosed until after the Class Period.

13. Two days later, Sheng Chen filed with the United States Securities and Exchange Commission a Schedule 13D in which he disclosed and attached for the first time a highly doctored version of the August 2021 Facility Agreement. To ensure that VNET investors would not be able to discover independently that an Early Termination event had already occurred, Sheng Chen replaced the actual trigger price of $8.50 set forth in the version of the Facility Agreement he filed with the United States Securities and Exchange Commission with a series of asterisks:

**8.3    Mandatory Prepayment – Early Termination**
If an Early Termination Event occurs:
(a)    the Borrower shall promptly notify the Lender upon becoming aware of that event;
(b)    the Lender shall not be obliged to fund any Utilisation; and
(c)    the Lender shall be entitled to, by notice to the Borrower, cancel the Commitments and declare that all outstanding Loan(s), together with accrued interest and all other amounts accrued or owing to the Lender under the Finance Documents (including the Exit Fees (Termination)), shall be due and payable within ten (10) Business Days from the date of such notice to the Borrower.

26

For the purpose of this Agreement, "**Early Termination Event**" means the ADS Price and/or the Disrupted ADS Price (as applicable) is lower than US$***** (subject to adjustment for share splits, share consolidations or other similar events in the same manner as set forth in the definition of Cap Price) for two (2) consecutive Trading Days.

Likewise, he obscured the entire "event of default" clause (21.16) by replacing the text in the disclosed version of the Facility Agreement with a series of asterisks:

**21.15 Default under other Finance Document**

An event occurs which is called an "event of default" under any Finance Document other than this Agreement.

**21.16** **********************************

Sheng Chen concealed this crucial provision because it, too, had already triggered. The language he removed provided an additional Event of Default if the collateral value (*i.e.*, the aggregate of the market value of collateral shares) fell below a pre-determined amount. Collateral shares were defined as: "(a) the ADSs of [VNET] which are, at that time, registered by the Depositary in the name of the Lender for the benefit of the Borrower (or the relevant Obligor) and subject to Transaction Security not prohibited by the Depositary and in form and substance satisfactory to [Bold Ally] and [Bold Ally] is provided with all documents, notices, other evidence as required under the relevant Security Document(s) and any security confirmations as may be required by [Bold Ally]; and the Class A Shares of [VNET] subject to Transaction Security in form and substance satisfactory to [Bold Ally] and [Bold Ally] is provided with all documents, notices, other evidence as required under the relevant Security Document(s) and any security confirmations as may be required by [Bold Ally]." The provision required that the referenced collateral stay above a threshold of $63,000,000, which would be violated if the ADS value dropped below approximately $11.80 as it did in late November 2021.

14. The April 8, 2022 Schedule 13D made no mention that ***both*** an Event of Default and an Early Termination event ***had already occurred***, and concealed the fact that Sheng Chen had entered into a standstill agreement only two days earlier to facilitate the transfer of his shares into Restricted ADSs so they could be dumped by Bold Ally as soon as the SEC Rule 144 restriction period lapsed.

15. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) Sheng Chen

6

had already defaulted on the Facility Agreement; (ii) Early Termination events under the Facility Agreement had already occurred; (iii) Bold Ally was free to exercise the Early Termination Provision contained in the Facility Agreement on any future Early Termination events thereunder; accordingly, as a result of (i)-(iii), (iv) Bold Ally then had the right to seize Sheng Chen's significant ownership stake in VNET; and due to (iv), (v) VNET was at risk of triggering of multiple Change of Control clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans, a violation so serious that post-Class Period reports indicated it threatened to shut down the entire Company.

16. On February 13, 2023, before the market opened, Bold Ally announced it would exercise its rights under the loan following a default by GenTao and was entitled to 48,515,634 Class A ordinary shares (which Sheng Chen and the Company had caused to be transferred into in the form of 8,085,939 Restricted ADSs)[4] and 27,757,992 Class B ordinary shares of the Company.

17. On this news, the VNET's ADS's share price fell $0.20, or 3.17% on February 13, 2023, on unusually heavy trading volume. VNET ADS's share price continued to decline by $1.09, or 17.8%, over the next trading session to close at $5.02 per share on February 14, 2023, again on unusually heavy trading volume.

18. Then, on February 15, 2023, before the market opened, Defendants announced that they had taken action to replace the voting interests that Sheng Chen lost when his shares were seized by creating and authorizing the issuance of up to 555,000 newly created Class D ordinary shares to Sheng Chen that carried 500 times the voting power of Class A shares. The Company stated this measure was required in order to "protect the Company's interests and continued stability" in the face of the destabilizing but long-known Facility Agreement violations. This was a direct consequence of

---

[4] Under SEC Rule 144, non-affiliates who receive restricted shares have a six-month holding period before the restriction can be released. The Issuer Acknowledgment Letter confirmed that Bold Ally was not considered an affiliate of VNET.

Sheng Chen's default on the Facility Agreement.

19. On this news, the Company's share price fell $0.33, or 6.3%, to $4.87, before rising slightly to close at $4.92 per share on February 15, 2023, on unusually heavy trading volume. Over the next day, VNET ADS shares dropped again to close at $4.78 on February 16, 2023. Over this two-day period, VNET ADS shares fell $0.42, or 8.07%.

20. Finally, on February 17, 2023, Sheng Chen filed with the United States Securities and Exchange Commission amended Schedule 13D which acknowledged that VNET knew of the Facility Agreement, signed a letter of acknowledgement, and agreed to take "specified administrative actions" in case Sheng Chen's shares were ever seized; and admitted, for the first time, that (a) Sheng Chen had been notified at least *five* times before and during the Class Period that he was in default and at risk of having his shares seized before they actually were; and (b) on February 8, 2023, Sheng Chen's shares had been transferred to Bold Ally.

21. In response to the news, over the next two trading days, the Company's ADS share price declined by $0.45, or 9.47%, to a low of $4.3, before closing at $4.57 on February 21, 2023. In total, from February 13, 2023, to February 21, 2023, VNET's ADS share price fell by $2.01, or 31.85%, in response to the disclosure of Sheng Chen's default, Bold Ally's seizure, and the newly created shares.

22. As a result of Defendants' wrongful acts and omissions, investors in VNET ADSs not only saw their economic and voting stakes in VNET significantly diluted, but also suffered a precipitous decline in the market value of the Company's securities. Consequently, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC

8

(17 C.F.R. § 240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

25. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Pursuant to VNET's most recently filed annual report, as of December 31, 2023, the Company had 182,142,651 shares of common stock outstanding. ET's securities trade on the NASDAQ. Accordingly, there are presumably hundreds, if not thousands of investors in VNET securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

26. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

27. Lead Plaintiff, as set forth in his previously-filed Certification (ECF 18-3), which is incorporated by reference herein, purchased or otherwise acquired VNET securities during the Class Period and has been damaged thereby.

28. Plaintiff Michael Semerak, as set forth in his previously-filed Certification (ECF 1), which is incorporated by reference herein, purchased or otherwise acquired VNET securities during the Class Period and has been damaged thereby.

29. Defendant VNET is incorporated under the laws of the Cayman Islands with its principal executive offices located in Beijing, China. VNET's ADSs trade on the NASDAQ under the symbol "VNET."

30. Defendant Josh Sheng Chen is a co-founder of the Company and served as the

9

Executive Chairman of the Company's Board from the founding of the Company through the present. As Executive Chairman of the Company, Sheng Chen had authority and oversight over VNET's business. Sheng Chen signed VNET's Form 20-F filings with the SEC.[5] Since August 9 2022, Sheng Chen was also a member of the compensation committee of the VNET Board of Directors, which oversees the compensation of VNET's officers, and a member of the nominating and corporate governance committee of the VNET Board of Directors, which oversees the composition and compensation of the VNET Board of Directors. Consequently, Sheng Chen wielded control over VNET's Board of Directors and management. In addition to his positions at VNET, Sheng Chen is also the sole owner and operator of GenTao, Fast Horse, Sunrise, Personal Group, and Beacon.

31.     Defendant Jie Dong ("Dong") was the Company's Chief Executive Officer ("CEO") from September 2022 through the end of the Class Period. He was previously the president of the Company and CEO of VNET Capital from June 2022 until September 2022. As a former executive of VNET Capital and later as CEO of VNET, Dong had access to, and authority and oversight over VNET's business. Dong also spoke to VNET investors in earnings calls about the Company's operations.

32.     Defendant Samuel Shen ("Shen") was the Company's CEO from September 2020 until September 2022. As CEO, Shen had access to, and authority and oversight over, VNET's business. Shen routinely certified filings with the SEC that affirmed that he had reviewed and evaluated VNET's filings with the SEC and concluded that VNET's filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

---

[5] SEC Form 20-F is an annual report that SEC rules require for all "foreign private issuers" with listed equity shares on exchanges in the U.S. Form 20-F calls for the submission of an annual report within four months of the end of a company's fiscal year or if the fiscal year-end date changes. *See* SEC "Topic 6 - Foreign Private Issuers & Foreign Businesses." https://www.sec.gov/corpfin/cf-manual/topic-6

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[,]" and that "[t]he information contained in [VNET's annual report filed with the SEC] fairly presents, in all material respects, the financial condition and results of operations of the Company." Shen also routinely spoke to VNET investors in earnings calls about the Company's operations.

33. Defendant Tim Chen ("Chen") was the Company's Chief Financial Officer ("CFO") at all relevant times. As CFO, Chen had access to, and authority and oversight over VNET's business. Chen routinely certified filings with the SEC that affirmed that he had reviewed and evaluated VNET's filings with the SEC and concluded that VNET's filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[,]" and that "[t]he information contained in the [20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company." Chen also routinely spoke to VNET investors in earnings calls about the Company's operations.

34. Defendants Sheng Chen, Dong, Shen, and Chen (collectively, the "Individual Defendants"), because of their responsibilities and authority within the Company, controlled the content of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

11

representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein. Further, Sheng Chen along with VNET participated in a scheme to hide his default of the Facility Agreement from investors and is liable for the scheme pleaded herein.

35. VNET and the Individual Defendants are collectively referred to as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.     VNET History and Business

36. VNET was founded in 1999 by Josh Sheng Chen, and incorporated in the Cayman Islands, originally under the name AsiaCloud. VNET is a holding company with operations primarily conducted by its subsidiaries. In 2010, VNET transitioned to the data center business with its first self-developed data center opening in 2010. Since then, the Company, through its subsidiaries, has provided hosting and related services, including data center services, cloud services, and business VPN services through which customers can connect to the internet in China. VNET's operation is headquartered in Beijing, and it claims to run more than 50 distributed data centers in more than 30 cities throughout mainland China, with more than 93,000 cabinets, more than 4T port capacity and more than 1T high-speed cloud dedicated lines.

37. For a majority of its history, VNET did business under the name "21Vianet Group Inc.", before officially changing its name to VNET Group Inc. in October 2021.

38. VNET operates through four domestic PRC companies: VNET Technology, BJ iJoy, WiFire Network, and SH Zhiyan. VNET controls (i) 100% of the equity interest in VNET Technology through its subsidiary, VNET China, which was incorporated in October 2022; (ii) 100% of the equity interest of BJ iJoy following the completion of its acquisition of 100% equity interest in iJoy in April 2013; (iii) 100% of the equity interests of WiFire Network through its subsidiary, aBitCool DG, which was incorporated in June 2014; and (iv) 100% of the equity interests of SH

12

Zhiyan and its wholly-owned subsidiary, SH Blue Cloud, through its subsidiary, SH Edge Connect, which was incorporated in November 2020.

39.    Below is an organizational chart outlining VNET and its host of subsidiaries:



40.    On April 21, 2011, VNET went public and its ADS shares were listed on the NASDAQ.  The ADS shares (as well as the Class A, B, C, and D shares discussed herein) represent equity in the VNET Cayman holding company, rather than in any specific Chinese operating entity.

41.    Throughout VNET's history, Sheng Chen has always held an outsized role at the Company and held a significant stake in the Company.

42.    On April 26, 2022, the Company filed its annual report on Form 20-F for the period ended December 31, 2021 with the SEC (the "2021 20-F").  The 2021 20-F, which was signed by Defendant Sheng Chen, described "with respect to the beneficial ownership of our ordinary shares, as of February 28, 2022, by: each of our directors and executive officers; and each person known to us to own beneficially more than 5.0% of our ordinary shares." It indicated that Sheng Chen owned

13

78,582,777 shares, or 8.8% of the Company, with 28.8% of the voting power outright, with an additional 48,515,635 shares (5.5% of the Company) with 4.2% voting power through his wholly owned company, GenTao:

**Shares Beneficially Owned**

| | Number | % of beneficial ownership | % of Voting Power[1][2] |
|---|---|---|---|
| **Directors and Executive Officers:** | | | |
| Sheng Chen[3] | 78,582,777 | 8.8 | 28.8 |
| Yoshihisa Ueno[4] | 5,073,276 | * | 2.1 |
| Kenneth Chung-Hou Tai | * | * | * |
| Sean Shao | * | * | * |
| Erhfei Liu | * | * | * |
| Yao Li | * | * | * |
| Samuel Yuan-Ching Shen | * | * | * |
| Tim Chen | * | * | * |
| Shiqi Wang | * | * | * |
| All Directors and Officers as a Group | 86,378,745 | 9.7 | 31.0 |
| **Principal Shareholders:** | | | |
| TT International Asset Management Ltd[5] | 78,069,384 | 8.8 | 6.7 |
| GIC Private Limited[6] | 75,411,438 | 8.5 | 6.5 |
| Vector Holdco Pte. Ltd.[7] | 62,412,780 | 7.0 | 5.4 |
| Tuspark Innovation Venture Limited[8] | 60,911,237 | 6.9 | 5.2 |
| Majara Investment Limited[9] | 53,942,424 | 6.1 | 4.6 |
| GenTao Capital Limited[3][10] | 48,515,635 | 5.5 | 4.2 |

43.     Thus, at the start of 2022, Sheng Chen owned 14.3% of VNET and had 33% voting power, more than any other person.

**II.     VNET's Dependence on Sheng Chen's Control**

44.     Sheng Chen's importance to VNET extended well beyond his chairmanship and his ownership in the Company, as multiple corporate documents and loans tied the Company's financial well-being to Sheng Chen continuing to have a significant stake in VNET.

45.     According to the Company's articles of association and financing legal documents, a default and divestment of Sheng Chen's stake in VNET would trigger Change of Control clauses contained in the Company's outstanding convertible bonds and domestic loans.  For example, on

14

January 28, 2022, VNET raised $250 million from funds managed by Blackstone Tactical Opportunities ("Blackstone") through the sale of convertible notes which had a term of five years and carried interest at 2% per annum. Embedded in the sales document was a clause that allowed Blackstone to redeem their convertible notes early if a "fundamental change" occurred. One fundamental change specified in the sales agreement was if Sheng Chen "ceases to be the largest holder of the Company's voting power represented by all voting securities of the Company (excluding all voting securities of the Company beneficially owned by the Investors and their affiliates (as such term is defined in Rule 405 under the Securities Act)) and (ii) the Founder has resigned from the Board, or been removed from the Board by the Board or the Company's shareholders[.]"

46.     According to post-Class Period reports, similar clauses existed in other convertible bonds and domestic loans, all of which totaled over $850 million. *See, e.g.*, Hins Li, Clifford Waits Kurz, VNET Group Inc. 'B' Rating Affirmed Despite Some Governance Weaknesses; Outlook Negative, S&P GLOBAL RATINGS, Feb. 23, 2023, at 1, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2952204 ("GenTao Capital Ltd., fully owned by VNET's founder Mr. Josh Sheng Chen, recently defaulted on a loan facility backed by his stake in VNET as collateral. This would have triggered Change of Control clauses embedded in the company's US$850 million outstanding convertible notes, and some of its domestic borrowings."); Du Cheng, Xuran Yang, China-U.S. Warfare in Cloud Services, Chinese IDC Companies Trigger Alarm in Unity, HUGE TRENDS BUSINESS REVIEW, May 17, 2023, https://cloud.ofweek.com/news/2023-05/ART-178801-8440-30596837.html ("In accordance with the Articles of Association of VNET and the various financing, legal documents entered into over the company's operations, the issue of Sheng Chen pledging his own shares for the loan may also trigger several change-of-control clauses contained in the outstanding convertible notes worth

US$850 million and part of the company's domestic borrowings.").

47. For this reason, commentators recognized after the Class Period that Sheng Chen's default on the Facility Agreement, combined with Bold ally's ability to thereunder seize his shares, posed an existential risk to the Company. *See* Du Cheng, Xuran Yang, China-U.S. Warfare in Cloud Services, Chinese IDC Companies Trigger Alarm in Unity, HUGE TRENDS BUSINESS REVIEW, May 17, 2023, https://cloud.ofweek.com/news/2023-05/ART-178801-8440-30596837.html ("If Sheng Chen's shares are completely auctioned off, it may directly lead to the immediate shut-down of the company's operations").

### III.   Sheng Chen's Other Businesses

48. In addition to his interest in VNET, Sheng Chen wholly owns at least five other companies: GenTao, Fast Horse, Sunrise, Personal Group, and Beacon, all of which are incorporated under the laws of the British Virgin Islands.

49. These entities operate as vehicles for Shen Chen's personal investments. For example, according to filings by Sheng Chen with the SEC, GenTao is "solely engaged in holding, distributing or effecting any sales of securities held by it. Mr. Sheng Chen wholly owns and controls all the outstanding securities of GenTao. Mr. Sheng Chen is the sole director of GenTao and there is no executive officer of GenTao."[6]

### IV.   Sheng Chen's Loan with Bold Ally

50. On August 19, 2021, Sheng Chen, through GenTao, entered into a loan agreement with Bold Ally (Cayman) Limited for $50,250,000, with Sheng Chen, Beacon, Fast Horse, and Sunrise as guarantors of the loan (the "Facility Agreement").[7] To secure the Facility Agreement,

---

[6] *See* Schedule 13D, filed on December 21, 2021.

[7] On August 27, 2021, the Facility Agreement was subsequently amended with respect to non-relevant terms. *See* Schedule 13D Ex. 99.15, filed on February 17, 2023.

GenTao committed its 48,515,635 Class A ordinary VNET shares as collateral.

51. As guarantors of the Facility Agreement, Sheng Chen, Beacon, Fast Horse, and Sunrise also committed to (a) guarantee timely performance by GenTao under the Facility Agreement; and (b) satisfy GenTao's obligations if it defaulted on the Facility Agreement.

52. Accordingly, to secure the Facility Agreement, Sheng Chen, Beacon, Fast Horse, and Sunrise in their capacity as guarantor pledged their VNET holdings as collateral and perfected that security interest via Cayman equity share mortgages dated August 19, 2021 with Bold Ally.

53. This meant that Sheng Chen had pledged all 78,582,777 VNET shares directly or indirectly owned by him as collateral to secure repayment of the loan, including:

> (i) 48,515,635 Class A ordinary shares held by GenTao Capital Limited ("GenTao"), (ii) 19,670,117 Class B ordinary shares held by Fast Horse Technology Limited ("Fast Horse"), (iii) 8,087,875 Class B ordinary shares held by Sunrise Corporate Holding Ltd. ("Sunrise"), (iv) four Class A ordinary shares, 769,486 Class B ordinary shares and 60,000 Class C ordinary shares held by Personal Group Limited ("Personal Group"), and (v) 1,479,660 Class A ordinary shares issuable upon vesting of Mr. Sheng Chen's restricted share units within 60 days.

54. As a result, a GenTao default on the Facility Agreement entitled Bold Ally to seize VNET shares owned by GenTao, Sheng Chen, Fast Horse, Sunrise, and Personal Group.

55. Because the Facility Agreement was dependent on Sheng Chen's VNET shares as collateral, it included an Early Termination Provision, which stated that if the VNET ADS price fell below $8.50 for two (2) consecutive trading days, Bold Ally would be entitled to cancel the Facility Agreement and declare that all outstanding loans, together with accrued interest and all other amounts accrued to Bold Ally, shall be due and payable within ten (10) business days from the date of such notice to GenTao and Sheng Chen.

56. The Facility Agreement included an additional clause stated that Sheng Chen was in default, and thus Bold Ally could exercise the Early Termination Provision, if the collateral if the collateral value (*i.e.*, the aggregate of the market value of collateral shares) fell below a pre-

17

determined amount. Collateral shares were defined as: "(a) the ADSs of [VNET] which are, at that time, registered by the Depositary in the name of the Lender for the benefit of the Borrower (or the relevant Obligor) and subject to Transaction Security not prohibited by the Depositary and in form and substance satisfactory to [Bold Ally] and [Bold Ally] is provided with all documents, notices, other evidence as required under the relevant Security Document(s) and any security confirmations as may be required by [Bold Ally]; and the Class A Shares of [VNET] subject to Transaction Security in form and substance satisfactory to [Bold Ally] and [Bold Ally] is provided with all documents, notices, other evidence as required under the relevant Security Document(s) and any security confirmations as may be required by [Bold Ally]." This ultimately created a threshold of $63,000,000, which would occur if the ADS share price dropped below approximately $11.80.

57. The Facility Agreement, and the consequences for Sheng Chen's default on the Facility Agreement, did not just impact Sheng Chen. As outlined in Section II above, the Change of Control clauses necessitated that Sheng Chen retain a controlling voting stake in VNET. Had Sheng Chen defaulted on the Facility Agreement and had his shares seized by Bold Ally, the Company would have been thrown into chaos. Consequently, the Facility Agreement did not just impact Sheng Chen, but instead VNET as a whole, as it created a significant and destructive risk in the event that Sheng Chen ever defaulted on the loan.

**V.      Sheng Chen is Put on Actual Notice That a Default Had Already Occurred**

58. From November 15, 2021 through December 15, 2021, VNET's ADS share price dropped precipitously, falling from $17.99 per share to a low of $7.70 per share. This decline caused VNET ADS's share price to fall below the Early Termination Provision's pre-determined threshold of $8.50 that would allow Bold Ally to cancel the Facility Agreement and declare the loan payable

18

within ten (10) days:



59.     On November 22, 2021 Bold Ally notified Gen Tao and Sheng Chen that collateral margin under the Facility Agreement was then deficient and demanded that more collateral be deposited.  According to a subsequent standstill letter acknowledged by Sheng Chen, that margin call was not satisfied.  As a result, Sheng Chen and Gen Tao remained in default of the Facility Agreement throughout the Class Period, which they hid from investors.

60.     On the three consecutive trading days of November 24, 26, and 29, 2021, the collateral pledged under the Facility Agreement fell below the pre-determined amount in the Facility Agreement, causing multiple Events of Default.[8]  On November 30, 2021, GenTao and Sheng Chen received a default notice from Bold Ally.  Although Defendants had actual knowledge of the default, neither the default nor notice thereof was disclosed to investors.

61.     Then, as VNET later admitted, on December 15, 2021, GenTao and Sheng Chen were provided another letter from Bold Ally providing further actual notice that Events of Default

---

[8] *See* Schedule 13D Ex. 99.13, filed on February 17, 2023.

remained and an Early Termination event had occurred under the Facility Agreement.[9] In response, on December 21, 2021, GenTao issued a written notice to Bold Ally, stating that it has pledged additional 16,680,000 Class A Ordinary Shares to Bold Ally pursuant to the Facility Agreement.

**VI.    Defendants Make Materially False and Misleading Statements Issued During the Class Period**

**A.    Defendants First Disclose the Bold Ally Loan to Investors**

62.    The Class Period begins on March 23, 2022, when VNET filed a Schedule 13D disclosing certain details about the Bold Ally loan to investors but omitting the most important parts. The March 23, 2022 Schedule 13D stated, in pertinent part:

> ***Bold Ally entered into a term loan facility and in connection with the facility agreement and related mortgage agreements, the borrower of that facility pledged certain Class A Ordinary Shares and Class B Ordinary Shares to Bold Ally as security for the term loan facility (the "Pledged Shares").*** Pursuant to the terms of the mortgage agreements, Bold Ally may be deemed to beneficially own the Pledged Shares.
>
> More specifically, as of the date that this Schedule 13G is filed, Bold Ally may be deemed to beneficially own (i) 48,515,635 Class A Ordinary Shares and (ii) 27,757,992 Class B Ordinary Shares, par value US$0.00001 per share, that are convertible into Class A Ordinary Shares on a one-for-one basis at any time (the "Class B Ordinary Shares"). This amount represents 8.6% of the issued and outstanding Class A Ordinary Shares based upon (i) 859,932,323 Class A Ordinary Shares outstanding as of December 31, 2021, as disclosed by the Issuer in its 6-K plus (ii) 27,757,992 Class A Ordinary Shares issuable upon the exchange of 27,757,992 Class B Ordinary Shares for Class A Ordinary Shares. The Reporting Persons, as a result of the relationships described below, may be deemed to directly or indirectly beneficially own the shares of Class A Ordinary Shares that may be beneficially owned by Bold Ally.[10]

63.    The statements identified in ¶62 above were materially false and misleading because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Gen Tao and Sheng Chen had already defaulted on the

---

[9] *See* 2023 Form 20-F, filed on April 26, 2024.

[10] Emphasis is added unless otherwise indicated.

Facility Agreement; (ii) Early Termination events under the Facility Agreement had already occurred; (iii) Bold Ally was free to exercise the Early Termination Provision contained in the Facility Agreement unless Gen Tao maintained the collateral at all times above the defined threshold, which it did not do; and (iv) as a result of (i)-(iii), the pledged shares were already at risk of seizure and VNET was already at risk of triggering of multiple Change of Control clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans, a deficiency so serious that domestic Chinese reports indicated it threatened to shut down the entire Company.

64.     On March 30, 2022, VNET filed a Form 6-K signed by Defendant Chen attaching a press release announcing the Company's unaudited financial results for the fourth quarter and full year ended December 31, 2021 (the "March 30, 2022 Press Release").[11] In the March 30, 2022 Press Release, Defendant Shen claimed that VNET had "continued to deliver robust growth *while further diversifying our financing solutions and augmenting the resilience of our business*."

65.     Also in the March 30, 2022 Press Release, Defendant Chen stated that "*we will continue to explore various financing solutions to enhance the health of our balance sheet*, capitalize on rapid growth in IDC demand, *and generate increasing value for our shareholders*."

66.     The statements identified in ¶¶64-65 above were materially false and misleading because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Sheng Chen had already defaulted on a Facility Agreement entered into for his personal benefit and an Early Termination event had already occurred under that Agreement, exposing his VNET holdings which had been pledged as collateral to seizure; (ii) consequently, there was already at that time a substantial threat to Sheng Chen's ownership which would trigger violation of the Change in Control covenants in the financing which was the subject of

---

[11] Foreign Private Issuers like VNET are required by the SEC to file a report on Form 6-K within four (4) days of any event that causes a material change in the issuer's affairs, such as changes in management, financial results, or business development.

this press release; (iii) as a result, the financing referenced in this press release did not "enhance the health of [VNET's] balance sheet" or "generate increasing value for [VNET] shareholders," but instead the financings exposed the Company to a Hobson's Choice of corporate default or exceptionally diluting the voting power of existing shareholders (and to a lesser extent, diluting their economic ownership).

67.     On March 31, 2022, VNET held its Fourth Quarter 2021 Earnings Conference Call (the "Q-4 2021 Earnings Call") with analysts and investors.  During the Q-4 2021 Earnings Call, Defendant Shen stated that:

> Beyond the execution of our strategy, *we're further exploring options to diversify our financing solutions and enhancing the resilience of our business. In January, we reached an agreement with Blackstone, the world's largest alternative investment firm, pursuant to which, Blackstone made an additional investment in VNET by purchasing $250 million of our convertible notes.*

68.     During the same Q-4 2021 Earnings Call, Defendant Chen reiterated Defendant Shen's vague commitment to "*continue to explore various financing solutions*," for VNET.

69.     The statements identified in ¶¶67-68 above were materially false and misleading because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Gen Tao and Sheng Chen had already defaulted on the Facility Agreement; (ii) Early Termination events under the Facility Agreement had already occurred; (iii) Bold Ally was free to exercise the Early Termination Provision contained in the Facility Agreement unless Gen Tao maintained the collateral at all times above the defined threshold, which it did not do; (iv) as a result of (i)-(iii), the pledged shares were already at risk of seizure and VNET was already at risk of triggering of multiple Change of Control clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans, a deficiency so serious that domestic Chinese reports indicated it threatened to shut down the entire Company; and (v) consequently, the financing referenced did not "enhance[e] the resilience of [VNET's] business" but instead exposed

22

the Company to a Hobson's Choice of corporate default or exceptionally diluting the voting power of existing shareholders (and to a lesser extent, diluting their economic ownership).

### B.    Sheng Chen Enters into a Standstill Agreement with Bold Ally and VNET Receives (and Disregards) a Privatization Offer from Hina Group

70.    On April 6, 2022, Sheng Chen, his personal holding companies, and Bold Ally entered into a standstill agreement which: (a) acknowledged that Sheng Chen was notified in November 2021 of his default of the Facility Agreement and the consequences resulting therefrom; (b) acknowledged that an Early Termination event as defined in the Facility Agreement had already occurred in late 2021; (c) arranged for the transfer of Sheng Chen's pledged shares into Restricted ADSs, so that after the passage of the Rule 144 restriction period, Boldy Ally could sell the ADS shares on U.S. markets; and (d) provided that Bold Ally would not take certain further other actions as a result of the default and Early Termination event.

71.    Significantly, the April 6, 2022 standstill agreement made clear that Bold Ally was free to exercise the Early Termination Provision on any other Early Termination events, which were continuing to occur throughout 2022.  Indeed, due to Sheng Chen's refusal to resolve his default under the Facility Agreement, he continued to receive notices that Early Termination events were occurring and Bold Ally was able to seize his shares, but refused to resolve his default under the Facility Agreement and hid that fact from VNET investors.

72.    Also on April 6, 2022, VNET received an unsolicited privatization offer from Hina Group and Industrial Bank, proposing to acquire all of the outstanding ordinary shares of the Company for $8.00 in cash per ADS, or approximately $1.3333 per ordinary share.

### C.    Sheng Chen Schemes to Hide Facility Agreement Terms From Investor

73.    On April 8, 2022 Sheng Chen filed a Form Schedule 13G stating that he had pledged all 78,582,777 shares beneficially owned by him as collateral for the Facility Agreement dated August 19, 2021:

23

(1) Representing (i) 48,515,635 Class A ordinary shares held by GenTao Capital Limited ("GenTao"), (ii) 19,670,117 Class B ordinary shares held by Fast Horse Technology Limited ("Fast Horse"), (iii) 8,087,875 Class B ordinary shares held by Sunrise Corporate Holding Ltd. ("Sunrise"), (iv) four Class A ordinary shares, 769,486 Class B ordinary shares and 60,000 Class C ordinary shares held by Personal Group Limited ("Personal Group"), and (v) 1,479,660 Class A ordinary shares issuable upon vesting of Mr. Sheng Chen's restricted share units within 60 days. Mr. Sheng Chen is the sole and direct shareholder of GenTao, Fast Horse, Sunrise and Personal Group and may be deemed to have beneficial ownership of the shares held by them.

(2) Calculation based on (i) 857,359,421 outstanding Class A ordinary shares (excluding treasury shares and Class A ordinary shares in the form of American Depositary Share ("ADS") that are reserved for issuance upon the exercise of share incentive awards), (ii) 30,721,723 outstanding Class B ordinary shares and (iii) 60,000 outstanding Class C ordinary shares. Holders of Class A ordinary shares, Class B ordinary shares and Class C ordinary shares have the same rights except for voting and conversion rights. Each Class A ordinary share is entitled to one vote, whereas (x) each Class B ordinary share is entitled to ten votes and is convertible into one Class A ordinary share at any time by the holder thereof and (y) each Class C ordinary share is entitled to one vote except for veto right on three corporate matters and is convertible into one Class A ordinary share at any time by the holder thereof. ***Based on the foregoing, 78,582,777 Class A ordinary shares beneficially owned by Mr. Sheng Chen represent approximately 8.9% of total outstanding Class A ordinary shares, approximately 8.8% of total outstanding ordinary shares and approximately 28.6% of the aggregate voting power of the total outstanding ordinary shares of the Issuer***.

*Facility Agreement*

GenTao, together with Beacon, Fast Horse and Sunrise (the "Corporate Guarantors") and Mr. Sheng Chen (the "Personal Guarantor"), ***entered into a Facility Agreement dated as of August 19, 2021 (the "Facility Agreement")*** with Bold Ally (Cayman) Limited (the "Lender"). ***Each of GenTao and the Corporate Guarantors entered into Cayman Equitable Share Mortgages dated as of August 19, 2021 (the "Closing Date") with the Lender, pursuant to which each of GenTao and the Corporate Guarantors pledged on the Closing Date all of the Class A Ordinary Shares and Class B Ordinary Shares owned by them as collateral to secure repayment of amounts outstanding under the Facility Agreement, and may be required to post additional collateral in certain circumstances (the "Cayman Equitable Share Mortgages").*** Mr. Sheng Chen entered into British Virgin Islands Equitable Share Mortgages dated as of the Closing Date with the Lender, pursuant to which Mr. Sheng Chen pledged on the Closing Date all of the British Virgin Islands shares of GenTao, Beacon and Sunrise as collateral to secure repayment of amounts outstanding under the Facility Agreement (the "BVI Equitable Share Mortgages" and together with the Facility Agreement and the Cayman Equitable Share Mortgages, the "Facility

24

Documentation"). As of the date of this statement, the BVI Equitable Share Mortgages for Beacon and Sunrise have been released.

*As of the Closing Date, GenTao has borrowed an aggregate of $50.25 million under the Facility Agreement. Pursuant to the Cayman Equitable Share Mortgages, GenTao and the Corporate Guarantors have collectively pledged, as of the date of this statement, 48,515,635 Class A Ordinary Shares and 27,757,992 Class B Ordinary Shares to secure borrowings under the Facility Agreement.*

The loan matures on or about August 19, 2022. The Facility Agreement provides GenTao with an option to refinance the loan and extend the maturity date for up to two years. *Upon the occurrence of certain events that are customary for this type of loan, the Lender may exercise its rights to require GenTao to pre-pay the loan proceeds, post additional collateral, or foreclose on, and dispose of, the pledged Class A Ordinary Shares, Class B Ordinary Shares and pledged British Virgin Islands shares of GenTao in accordance with the Facility Documentation.*

74. Defendant Sheng Chen signed the April 8, 2022 Schedule 13G.

75. The statements identified in ¶73 above were materially false and misleading because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (i) Gen Tao and Sheng Chen had already defaulted on the Facility Agreement; (ii) Early Termination events under the Facility Agreement had already occurred; (iii) Bold Ally was free to exercise the Early Termination Provision contained in the Facility Agreement unless Gen Tao maintained the collateral at all times above the defined threshold, which it did not do; and (iv) as a result of (i)-(iii), the pledged shares were already at risk of seizure and VNET was already at risk of triggering of multiple Change of Control clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans, a deficiency so serious that domestic Chinese reports indicated it threatened to shut down the entire Company.

76. Attached to Sheng Chen's Form Schedule 13G was a doctored version of the Facility Agreement itself. Significantly, Sheng Chen altered the Facility Agreement to obscure the $8.50 price which allowed Bold Ally to exercise the Early Termination Provision by replacing the figures contained in the actual agreement with asterisks:

25

**8.3    Mandatory Prepayment – Early Termination**

If an Early Termination Event occurs:

(a)    the Borrower shall promptly notify the Lender upon becoming aware of that event;

(b)    the Lender shall not be obliged to fund any Utilisation; and

(c)    the Lender shall be entitled to, by notice to the Borrower, cancel the Commitments and declare that all outstanding Loan(s), together with accrued interest and all other amounts accrued or owing to the Lender under the Finance Documents (including the Exit Fees (Termination)), shall be due and payable within ten (10) Business Days from the date of such notice to the Borrower.

---

26

For the purpose of this Agreement, **"Early Termination Event"** means the ADS Price and/or the Disrupted ADS Price (as applicable) is lower than US$***** (subject to adjustment for share splits, share consolidations or other similar events in the same manner as set forth in the definition of Cap Price) for two (2) consecutive Trading Days.

77.    Likewise, he obscured the entire "event of default" clause (21.16) by replacing the text in the disclosed version of the Facility Agreement with a series of asterisks:

**21.15    Default under other Finance Document**

An event occurs which is called an "event of default" under any Finance Document other than this Agreement.

**21.16    ***********************************

78.    The "event of default" clause (21.16) that Sheng Chen altered out of the filed version of the Facility Agreement included a collateral value threshold ($63,000,000, which would occur if the ADS share price dropped below approximately $11.80), which, if breached, constituted a default under the Facility Agreement.

79.    Sheng Chen's alteration to the filed version of the Facility Agreement was intended to, and did, further conceal that an Event of Default and an Early Termination event *had already occurred*.

80.    Sheng Chen's Form Schedule 13G also attached an acknowledgment letter between VNET and Bold Ally, entered into on September 10, 2021, which acknowledged the Facility Agreement itself, the VNET shares that Sheng Chen and his entities pledged as collateral, and the administrative actions that VNET would take, were Bold Ally to seize Sheng Chen's shares. Thus,

26

at the start of the Class Period, VNET was fully aware of the Facility Agreement, its terms, and the

Early Termination price of $8.50 that would cause Sheng Chen to be in default.[12]

### D.  VNET Misleads Investors in its Form 20-F Annual Report

81.    On April 26, 2022, the Company filed its annual report on Form 20-F for the period

ended December 31, 2021 with the SEC.  The 2021 20-F, which was signed by Defendant Sheng

Chen, stated in relevant parts:

> Consists of (i) 48,515,635 Class A ordinary shares held by GenTao Capital Limited ("GenTao)", a British Virgin Islands company solely owned by Mr. Chen; (ii) 19,670,117 Class B ordinary shares held by Fast Horse Technology Limited ("Fast Horse"), a British Virgin Islands company solely owned by Mr. Chen; (iii) 8,087,875 Class B ordinary shares held by Sunrise Corporate Holding Ltd. ("Sunrise"), a British Virgin Islands company solely owned by Mr. Chen; (iv) 60,000 Class C ordinary shares, 769,486 Class B ordinary shares and four Class A ordinary shares held by Personal Group Limited, a British Virgin Islands company solely owned by Mr. Chen; and (v) 1,479,660 Class A ordinary shares upon vesting of Mr. Chen's restricted share units within 60 days of February 28, 2022. *Mr. Sheng Chen, as a personal guanrantor, together with GenTao, Beacon Capital Group Inc. ("Beacon"), Fast Horse and Sunrise, entered into a Facility Agreement dated as of August 19, 2021 (the "Facility Agreement") with Bold Ally (Cayman) Limited ("Bold Ally"). Mr. Sheng Chen entered into British Virgin Islands Equitable Share Mortgages dated as of August 19, 2021 with Bold Ally, pursuant to which Mr. Sheng Chen pledged on August 19, 2021 all of the British Virgin Islands shares of GenTao, Beacon and Sunrise as collateral to secure repayment of amounts outstanding under the Facility Agreement.*

82.    The statements identified in ¶81 above were materially false and misleading because

the statements omitted to disclose the following material adverse information necessary to make the

statements made not misleading:  (i) Gen Tao and Sheng Chen had already defaulted on the Facility

Agreement; (ii) Early Termination events under the Facility Agreement had already occurred; (iii)

Bold Ally was free to exercise the Early Termination Provision contained in the Facility Agreement

unless Gen Tao maintained the collateral at all times above the defined threshold, which it did not

do; and (iv) as a result of (i)-(iii), the pledged shares were already at risk of seizure and VNET was

---

[12] *See* Schedule 13D Ex. 99.3, filed on April 8, 2022.

already at risk of triggering of multiple Change of Control clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans, a deficiency so serious that domestic Chinese reports indicated it threatened to shut down the entire Company.

83. The 2021 20-F also purported to disclose the following risks to investors with respect to the ADSs:

**Risks Related to Our ADS**

- *The market price of our ADSs has fluctuated and may continue to be volatile, which could result in substantial losses to holders of our ADSs.*

- Our directors and employees may face claims and lawsuits as a result of their position in other companies, which may also harm our reputation.

- *Our triple-class voting structure will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.*

- *Future sales of a substantial number of our ADSs in the public market, or the perception that these sales could occur, could cause the price of our ADSs to decline.*

84. The statements identified in ¶83 above were materially false and misleading because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (i) the risk of "substantial losses to holders of [VNET] ADSs" was far less attributable to normal market volatility than to Sheng Chen's then-existing default on the Facility Agreement, the occurrence of Early Termination events under the Facility Agreement, and the fact that Bold Ally was free to exercise the Early Termination Provision contained in the Facility Agreement on any future Early Termination events thereunder; and (ii) change of control transactions were unlikely to be "discourage[d]", but rather were more likely to occur via the triggering of multiple Change of Control clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans, a deficiency so serious that domestic Chinese reports indicated it threatened to shut down the entire Company.

28

**E.    Sheng Chen Misleads Investors in Response to Additional Privatization Offers**

85.    Shortly thereafter, private entities other than Hina Group began to assemble bids to take VNET private.  For example, in July 2022, there were reports that MBK Partners, a private equity firm focused on North Asia, was considering making an offer to privatize VNET.

86.    At the same time, Sheng Chen continued to be in default of the Facility Agreement. On July 11, 2022, Sheng Chen received a letter from Bold Ally, stating that the standstill period had ended and Sheng Chen was still in default and the Early Termination events were continuing.

87.    Instead of disclosing that he was so underfunded that he could not even satisfy existing obligations, Sheng Chen pretended to VNET investors that he had sufficient capital to buy the entirety of the Company.  On September 13, 2022, Sheng Chen announced a "preliminary non-binding proposal" to acquire all of VNET's shares at $8.20 per ADS in cash.  Notably, this offer was $0.20 per ADS higher than the Hina Group and Industrial Bank offer.

88.    In connection with Sheng Chen's purported offer, VNET filed a Schedule 13D with the SEC on September 14, 2022, which was signed by Sheng Chen.  The September 14, 2022 Schedule 13D stated as follows:

> ***Except as set forth above, none of the Reporting Persons*** [including Sheng Chen] ***has any plans or proposals that relate to or would result in:***
>
> (a) the acquisition by any person of additional securities of the Issuer, or the disposition of securities of the Issuer;
>
> (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the Issuer or any of its subsidiaries;
>
> (c) a sale or transfer of a material amount of assets of the Issuer or any of its subsidiaries;
>
> (d) any change in the present board of directors or management of the Issuer, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board;

29

(e) any material change in the present capitalization or dividend policy of the Issuer;

***(f) any other material change in the Issuer's business or corporate structure***;

(g) changes in the Issuer's charter, bylaws or instruments corresponding thereto or other actions that may impede the acquisition of control of the Issuer by any person;

(h) a class of securities of the Issuer to be delisted from a national securities exchange or cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association;

(i) a class of equity securities of the Issuer becoming eligible for termination of registration pursuant to section 12(g)(4) of the Securities Act; or

***(j) any action similar to any of those enumerated above***.

89. The statements identified in ¶88 above were materially false and misleading because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (i) Gen Tao and Sheng Chen had already defaulted on the Facility Agreement; (ii) Early Termination events under the Facility Agreement had already occurred; (iii) Bold Ally was free to exercise the Early Termination Provision contained in the Facility Agreement unless Gen Tao maintained the collateral at all times above the defined threshold, which it did not do; (iv) as a result of (i)-(iii), the pledged shares were already at risk of seizure and VNET was already at risk of triggering of multiple control change clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans, a deficiency so serious that domestic Chinese reports indicated it threatened to shut down the entire Company; (v) Sheng Chen had already caused VNET to enter into an Issuer Acknowledgment Letter with Bold Ally outlining material changes in VNET's corporate structure that would be necessitated by his breach of the Facility Agreement, including the transformation of Sheng Chen's Class A shares into Restricted ADS that after the Rule 144 restriction period could be dumped on U.S. markets, dramatically expanding the float and pressuring share price; and (vi) as a result of the Change in Control provisions there would necessarily be enormous changes

30

to the Company's capital structure due to the looming seizure of Sheng Chen's shares that would eliminate his position as the largest shareholder and violate those covenants.

90.  On September 15, 2022, after the market closed and on the heels of Sheng Chen's privatization offer, VNET announced that Defendant Shen had resigned as CEO, and had been replaced by Defendant Dong.

91.  On October 14, 2022, the VNET Board of Directors announced that a special committee was formed to "evaluate and consider the previously announced preliminary non-binding acquisition proposal letter dated September 13, 2022 from Mr. Josh Sheng Chen, founder of the Company and the Executive Chairman of the Board, to acquire all of the outstanding ordinary shares of the Company (the "Proposal") as well as other potential strategic alternatives that the Company may pursue." Additionally, the Company announced that it had retained Kroll Securities, LLC and Kroll, LLC (operating through its Duff & Phelps Opinions Practice) as its independent financial advisor, and Davis Polk & Wardwell LLP as its independent legal counsel to consider Sheng Chen's proposal.

92.  Not surprisingly given his lack of funds to even pay back Bold Ally, Sheng Chen never followed through on his proposal to privatize VNET.

**F.  Sheng Chen Continues to Default on the Facility Agreement**

93.  On November 4, 2022, Bold Ally issued three demand letters to (a) Sheng Chen and GenTao, (b) Fast Horse and GenTao, and (c) Sunrise and GenTao – all claiming payments pursuant to the Facility Agreement.

94.  On November 22, 2022, VNET filed a press release with the SEC on Form 6-K signed by Defendant Chen and announcing the Company's unaudited financial results for the three months ended September 30, 2022 (the "November 22, 2022 Press Release"). In the November 22, 2022 Press Release, Defendant Dong claimed that "*[w]e will continue to execute prudently yet decisively,*

31

*strategically positioning VNET to capture rising opportunities and creating sustainable value for our stakeholders along the way."*

95.     The statement identified in ¶94 above was materially false and misleading because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Gen Tao and Sheng Chen had already defaulted on the Facility Agreement; (ii) Early Termination events under the Facility Agreement had already occurred; (iii) Bold Ally was free to exercise the Early Termination Provision contained in the Facility Agreement unless Gen Tao maintained the collateral at all times above the defined threshold, which it did not do; and (iv) as a result of (i)-(iii), Defendants had not "execute[d] prudently" and the pledged shares were already at risk of seizure and VNET was already at risk of triggering of multiple Change of Control clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans, a deficiency so serious that domestic Chinese reports indicated it threatened to shut down the entire Company; and (v) Defendants' conduct was the direct opposite of "captur[ing] rising opportunities" or "creating sustainable value for [VNET] stakeholders," particularly where Defendants rejected privatization offer(s) that would have benefitted investors.

96.     On January 18, 2023, Bold Ally issued a second set of demand letters to GenTao, Fast Hord, Sunrise, and Sheng Chen, claiming that the total amounts payable in connection with the Facility Documentation were US$69,203,246.74 as of January 18, 2023.

97.     Despite these notices, Sheng Chen never resolved his default of the Facility Agreement and Defendants continued to conceal the truth from VNET investors throughout the Class Period.

### G.     GenTao Defaults on the Bold Ally Loan

98.     On February 13, 2023, before the market opened, Bold Ally announced in a press release that GenTao had defaulted on the margin loan, and Bold Ally had in turn enforced the terms

32

of the Facility Agreement. The press release stated:

Following the occurrence of a *default by GenTao Capital Limited* (the "Borrower"), a shareholder of VNET Group, Inc. (the "Company") (NASDAQ: VNET), *under a US$50,250,000 margin loan facility (the "Facility"), Bold Ally (Cayman) Limited (the "Lender") has exercised its rights with respect to the collateral securing the Borrower's repayment obligations under the Facility. A total of 48,515,634 Class A ordinary shares (in the form of 8,085,939 American depositary shares) and 27,757,992 Class B ordinary shares of the Company have been pledged to secure the Facili*ty.

The Borrower is wholly owned by Mr. Chen Sheng, also known as Josh Sheng Chen ("Mr. Chen"), the Chairman of the Company's Board of Directors. The Facility is full recourse to Mr. Chen.

Under the Facility, the Lender has the right to convert the pledged Class B ordinary shares into Class A ordinary shares and/or deposit such Class A ordinary shares in exchange for American depository shares. There are no applicable lock-up restrictions in respect of the Class A ordinary shares or the American depository shares of the Company (collectively, the "Securities"). *Assuming that all Securities pledged under the Facility were sold, Mr. Chen's voting interest in the Company would significantly decrease*.

The Lender expects the effect sales of the Securities in one or more public market and/or private transactions, depending on market conditions. No assurance can be give how many sales will occur and the lender will not have a commitment to purchase any Securities. No prospectus or other offering document will be used in connection with any sale of the Securities and the Company will not be involved with, or otherwise participate in, any such sale; sales will be made by the Lender solely on the basis of public information.

99. Notably, if all 76,273,626 pledged shares were converted into ADS and sold at the ADS market price at the time of Bold Ally's announcement, even if such sales did not further depress ADS prices they would raise just over $40 million – well short of the funds needed to repay the Facility Agreement's loan. As a result, in order to recoup its loan, Bold Ally would be entitled to seize and auction off the rest of Sheng Chen's VNET shares, thereby entirely eliminating Sheng Chen's stake in the Company.

100. On this news, the Company's ADS share price fell $0.20, or 3.17% on February 13, 2023, on unusually heavy trading volume. The Company's ADS's share price continued to decline by $1.09, or 17.8%, over the next consecutive trading session to close at $5.02 per share on February

33

14, 2023, again on unusually heavy trading volume.

101. VNET ADS would have fallen even further but Defendants stemmed the fall by omitting the full truth. They did not then disclose the risk that Sheng Chen's default of the Facility Agreement posed, causing investors to incorrectly believe that the impact of default would be limited to Sheng Chen, and not VNET. Indeed, analysts initially believed that GenTao's default would only impact Sheng Chen and, at most, Sheng Chen's privatization efforts, and not VNET. *See* Sara Wang, Jasmine Huang, Navin Killa, *21 Vianet: Founder defaulted on US$ share-backed loan*, UBS Group AG, February 14, 2023, at 1 ("**Our reads: increasing uncertainty around privatization.** With the default on the loan, we believe it is less likely for VNET's founder to successfully take the firm private, as a total US$1.2bn would be required."); Edison Lee, Charlie Bai, Nick Cheng, Jacky He, Xinxin Zhao, *Certainly a Twist & Turn but Would Not Impact Privatization*, Jeffries Group LLC, February 14, 2023, at 1 ("VNET's founder defaulted on a US$50m loan collateralized by his 8.6% stake (he owns 8.9% in total). The lender said on Monday night they "have exercised their rights wrt [sic] the pledge", and could sell those shares any time. But given no SEC filing of stake change, this is likely a negotiation tactic on both sides, in our view. We believe this does not change the privatization story, and may even raise its likelihood. The selloff creates a buying opportunity.").

102. On February 15, 2023, before the market opened, VNET issued a press release that announced that the VNET Board of Directors approved the creation of 555,000 new Class D shares, which would be entitled to 500 votes per share, and authorized the issuance of these newly created shares to Sheng Chen, thereby giving Sheng Chen more than 20% voting power in VNET and massively diluting the voting interests (and to a lesser extent the economic interests) of public investors, all in order to sustain Sheng Chen's interest in the Company and avoid triggering Change of Control clauses in VNET's convertible notes and domestic loans:

> *On February 15, 2023, VNET Group, Inc. (Nasdaq: VNET) ("VNET" or the "Company") announced that its board of directors (the "Board") has approved*

34

*and authorized the issuance of up to 555,000 newly created Class D ordinary shares to Mr. Sheng Chen ("Mr. Chen"), the Executive Chairman of the Board.* The Class D ordinary shares will have the same rights as the Company's existing Class B ordinary shares except for voting rights, and *holders of Class D ordinary shares shall be entitled to 500 votes per share on all matters submitted to shareholder vote.*

*The proposed issuance of Class D ordinary shares is subject to and conditional upon the occurrence of conversion of pledged Class B ordinary shares beneficially owned by Mr. Chen into Class A ordinary shares upon a transfer to any person who is not an affiliate of Mr. Chen (each, a "Class B Conversion").* Following each Class B Conversion, the Company will issue a number of Class D ordinary shares to Mr. Chen that is equal to one-fiftieth (1/50) of the number of converted Class B ordinary shares, with fractional shares rounded down to the nearest whole share. The purchase price for each Class D ordinary share shall be equal to the volume weighted average price of the Company's American depositary shares ("ADSs") for the 30 trading days immediately prior to applicable issuance date, adjusted by the ADS-to-share ratio. Each ADS represents six Class A ordinary shares of the Company.

*This issuance of the newly created Class D ordinary shares is an initiative by the Board to protect the Company's interests and continued stability.*

The proposed issuance of Class D ordinary shares has been approved by the Company's audit committee and board of directors. No Class D ordinary shares have been issued as of the date of this announcement. *Assuming the conversion of all pledged Class B ordinary shares beneficially owned by Mr. Chen into Class A ordinary shares and the issuance of 555,000 Class D ordinary shares to Mr. Chen, Mr. Chen will own more than 20% of the total voting power of the Company.*

103.    Notably, the issuance of the new 555,000 Class D ordinary shares referenced "the occurrence of conversion of pledged Class B ordinary shares beneficially owned by Mr. Chen into Class A ordinary shares upon a transfer to any person who is not an affiliate of Mr. Chen (each, a 'Class B Conversion')." Thus, VNET created and authorized the issuance to Sheng Chen of up to 555,000 new shares in direct response to the transfer of Sheng Chen's then-existing VNET stake as a result of his default of the Facility Agreement, thereby converting a corporate interest to the personal benefit of Sheng Chen, without shareholder approval or even advance notice.

104.    Because the Class B ordinary shares seized by Bold Ally had 10 times the voting rights compared to Class A ordinary shares, thereby giving Bold Ally or anyone who purchased the

35

seized shares an outsized voting interest at VNET, the Company made the newly created shares "entitled to 500 votes per share on all matters submitted to shareholder vote."

105. According to VNET, this action was taken by the VNET Board of Directors to "protect the Company's interests and continued stability." This admission concedes that the concealed default and Early Termination events under the Facility Agreement were destabilizing and material to the Company, and thus should have been honestly and timely disclosed to investors.

106. On this news, the Company's ADS price fell $0.33, or 6.3%, to $4.87, before rising slightly to close at $4.92 per share on February 15, 2023, on unusually heavy trading volume. Over the next day, VNET's ADS shares dropped again to close at $4.78 on February 16, 2023. Over this two-day period, VNET's ADS's share price fell $0.42, or 8.07%.

107. Finally, on February 17, 2023, Sheng Chen filed a Schedule 13D which finally disclosed the letter of acknowledgment signed between VNET and Bold Ally, and admitted, for the first time, that (a) Sheng Chen had been notified at least *five* times during the Class Period that he was in default and at risk of having his shares seized before they actually were; and (b) on February 8, 2023, GenTao's shares were transferred to Bold Ally. Thus, Sheng Chen's February 17, 2023 13D informed investors, finally, of the risks posed by the Facility Agreement, and Defendants' knowledge of Sheng Chen's continued default of the Facility Agreement.

108. In response to this news, over the next two trading days, VNET's ADS price declined by $0.45, or 9.47%, to a low of $4.3, before closing at $4.57 on February 21, 2023.

109. From February 13, 2023 to February 21, 2023, VNET's ADS price fell by $2.01, or 31.85%, in response to VNET's news of Sheng Chen's default, and the newly created shares.

110. By the graft concealed by Class Period misrepresentations, Sheng Chen was able to retain both the proceeds of his personal $50.25 million loan, and his stake and power in the Company. Public shareholders and the Company paid the cost. As one report, which chided Sheng Chen for

36

"playing games with his shares in the company, raising a lot of governance questions", put it:

> It's not clear what [Sheng] Chen's loan was for or whether he had the funds to repay it. But regardless, he seems to have succeeded in cashing out his shares while retaining his control over VNET. *The way he did it, essentially using his clout at the company to trample on minority shareholders, won't go down so well with any potential new investors. But VNET needs to raise funds from investors to repay its creditors, including the holders of its convertible notes.*
>
> *While what happened is quite colorful in the stodgy world of corporate lore, the more serious ramification is that borrowing will become more difficult and costly for VNET.* Early last month, Fitch downgraded the company's debt deeper into junk territory, citing refinancing risks. And this month, it withdrew its ratings of the company altogether. Moody's also put the company under review for a possible downgrade last month.[13]

111.    Defendants' attempt to secure Sheng Chen's power by rejecting lucrative external privatization offers also left VNET in dire straits at the end of the Class Period:

> *[D]espite earlier interest, suitors won't exactly be lining up to buy the company in its current state.* Its financial performance remains uninspiring, for starters.
>
> \* \* \* \*
>
> VNET did receive an unsolicited bid last April from Chinese private equity firm Hina Group with financial backing from the Shanghai branch of Industrial Bank Co. Ltd., which was followed by a competing offer from [Sheng] Chen in September ….
>
> *But a formal Hina offer has never materialized — and in fact, VNET's shares now trade well below the offer price of $8 per ADS. The stock last closed at $3.20, less than half the offer price, which includes a 12% drop the day after the results announcement.* Some other possible acquirers, including MBK Partners in South Korea, have popped in media reports, probably attracted by the company's bargain price. *But no one seems in a rush to sign a deal right now, and it's not hard to understand why.*[14]

---

[13] *See* Warren Yang, VNET Mired in Mess of Red Ink, Chairman's Dubious Stock Maneuvers, BAMBOO WORKS, Mar. 29, 2023, https://thebambooworks.com/vnet-mired-in-mess-of-red-ink-chairmans-dubious-stock-maneuvers/

[14] *Id.*

## VII. Additional Allegations of Scienter

### A. Defendants Had Actual Notice of the Concealed Information

112. On November 22, 2021, Bold Ally notified Gen Tao and Sheng Chen that its margin under the Facility Agreement was deficient and asked for more collateral to be deposited. Then, on November 30, 2021, GenTao and its sole owner, Sheng Chen, received a default notice from Bold Ally. As VNET subsequently admitted, on December 15, 2021, GenTao and its sole owner, Sheng Chen, received a letter from Bold Ally claiming that events of a default were continuing and an Early Termination event had occurred under the Facility Agreement.[15] In response, on December 21, 2021, GenTao issued a written notice to Bold Ally, stating that it has pledged additional 16,680,000 Class A Ordinary Shares to Bold Ally pursuant to the Facility Agreement. Accordingly, VNET's founder and Executive Chairman knew as early as November 30, 2021, before the start of the Class Period, that the risk of GenTao defaulting, and thus triggering a shutdown of VNET, had already begun to materialize. Sheng Chen also knew independently of these notices because he had signed the Facility Agreement and had actual notice of its terms. VNET and its executives, at all times, also had access to the actual Facility Agreement, and therefore knew that its Event of Default and Early Termination Provision had been breached, and VNET had expressly acknowledged what would occur in the case of a default long before the Class Period.

113. On April 6, 2022, Sheng Chen was again notified by Bold Ally that multiple Early Termination events occurred within the prior months and entered into a standstill letter agreement with Bold Ally recognizing that multiple Early Termination events occurred and that Bold Ally could exercise the Early Termination Provision in the future if Early Termination events continued to occur. VNET and its executives were also provided actual notice of the breach because the standstill letter agreement required the transfer of holdings into Restricted ADS, which required action on their part

---

[15] *See* 2023 Form 20-F, filed on April 26, 2024.

Case 1:23-cv-11187-DEH Document 64 Filed 05/23/25 Page 59 of 96

as set forth therein, including sending instruction letters to the Cayman Registrar and obtaining confirmation of transfer.

114. On July 11, 2022, Sheng Chen was notified that the standstill period had ended and the events of default and the Early Termination events were continuing.

115. On November 4, 2022, Bold Ally issued three demand letters to (a) Sheng Chen and GenTao, (b) Fast Horse and GenTao, and (c) Sunrise and GenTao — all demanding payments pursuant to the Facility Agreement.

116. Finally, on January 18, 2023, Bold Ally issued another set of demand letters to GenTao, Fast Horse, Sunrise, and Sheng Chen, specifying that the total amounts payable in connection with the Facility Agreement were US$69,203,246.74 as of January 18, 2023.

117. Despite all these notices, Sheng Chen continued to hide from investors the already-materialized, known risks.

**B. The Temporal Proximity of Significant Events During the Class Period Support Scienter**

118. The temporal proximity between Sheng Chen's entering of the standstill agreement and his filing of his Schedule 13D two days later bolsters his scienter.

119. On April 6, 2022, Sheng Chen, his personal holding companies, and Bold Ally entered into a standstill agreement which: (a) acknowledged that Sheng Chen was notified in November 2021 of his default of the Facility Agreement and the consequences resulting therefrom; (b) acknowledged that an Early Termination event had occurred in late 2021; (c) arranged for the transfer of Sheng Chen's pledged shares into Restricted ADSs, so that after the passage of the restriction time under SEC Rule 144, Boldy Ally could sell the ADS shares on the open market; and (d) provided that Bold Ally would not take certain further other actions as a result of the default and Early Termination event.

120. *Just two days later*, Sheng Chen filed with the United States Securities and Exchange

39

Commission a Schedule 13D in which he disclosed and attached for the first time a highly doctored version of the August 2021 Facility Agreement which obscured both the $8.50 trigger price in the Early Termination Provision and the entirety of the Event of Default provision. That Sheng Chen omitted the most pertinent parts of the Facility Agreement – which could inform investors that he was already in default of the Facility Agreement – so shortly after he entered into the standstill agreement where he acknowledged that he was in default of the Facility Agreement makes it implausible at best that his doctored filing was not an attempt to hide from investors the truth that he was already in default of the Facility Agreement.

121. Similarly, the rapidity at which VNET authorized and created new shares bolsters Defendants scienter that they knew of Sheng Chen's default, and the actions it would need to take in response, well before February 15, 2023.

122. On February 8, 2023, as admitted by Sheng Chen, Bold Ally had seized GenTao's shares in VNET.[16] On February 13, 2023, Bold Ally announced that GenTao officially defaulted on the Facility Agreement and it would seize and auction all pledged VNET shares of Sheng Chen to satisfy the outstanding loan.

123. Within five days of Bold Ally's seizure of shares and within two days of Bold Ally's announcement, Defendants acknowledged they believed it necessary to issue Sheng Chen 555,000 newly-created super-voting shares in VNET with a 500-to-1 voting interest, explicitly tying their distribution to the seizure of VNET's shares by Bold Ally.

124. The authorization and creation of such a monumental number of shares, which sustained Sheng Chen's voting interest above 20%, would have required, at the very least: (1) a convening of VNET's Board of Directors so that approval could be obtained; (2) the participation of legal counsel to draft all necessary documents to ensure that the issuance of the newly created shares

---

[16] *See* Schedule 13D, filed on February 17, 2023.

40

complied with all necessary rules and regulations; and (3) the participation of a public relations team to draft, revise, finalize and issue the February 15, 2023 press release announcing the issuance of new shares.

125.    The idea that all this was accomplished within the time Bold Ally officially took hold of GenTao's shares in VNET and announced the same to investors is farfetched.  The only plausible inference is that these steps had been long-planned, since the Company knew since 2021 that Sheng Chen had been in default and knew since the April 6, 2022 standstill letter that Sheng Chen's shares would be converted into Restricted ADS that would become saleable by early 2023.

126.    That the new issuance was long-planned and known is bolstered by the acknowledgment letter VNET entered into with Bold Ally on September 10, 2021, which put VNET on notice of the Facility Agreement and the risk it posed.[17]

### C.    Defendant Shen's Resignation Bolster's Scienter

127.    On September 15, 2022, after the market closed, VNET announced that Defendant Shen had resigned as CEO, and was replaced by Defendant Dong.

128.    This resignation occurred only two days after Sheng Chen made his privatization offer to VNET and one day after VNET filed a Schedule 13D with the SEC which contained misleading statements.  The temporal proximity between VNET's misleading statements connected to Sheng Chen's privatization offer and Defendant Shen's resignation from VNET contributes to a strong inference of scienter.

### D.    That Individual Defendants Certified VNET's Filing to Investors Bolsters Scienter

129.    Defendants' Shen and Chen's actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certification in connection with

---

[17] *See* Schedule 13D Ex. 99.3, filed on April 8, 2022.

41

VNET's filing of its Form 20-F with the SEC. These certifications certified, among other things, that "[VNET's 20-F] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[,]" and that "[t]he information contained in the [20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

130. If Individual Defendants Shen and Chen had, in fact, made that assessment, then they were aware of the material risk that GenTao's pending default posed, and should have informed investors of the truth. If they had not, then they were reckless in making such statements to investors.

### E. That Individual Defendants Had Access to the Concealed Truth Bolsters Scienter

131. That Defendants Sheng Chen, Dong, Shen, and Chen were VNET's most senior executives and on its management, team further supports an inference of scienter. Defendants Sheng Chen, Dong, Shen, and Chen knew facts and had access to information suggesting that their public statements were not accurate or failed to check the information they had a duty to monitor.

132. As senior executives, Individual Defendants would have known about the Change of Control clauses contained in the Company's $850 million outstanding convertible bonds and domestic loans. Indeed, Sheng Chen signed the January 28, 2022 agreement with Blackstone that contained the Change of Control clause, and Defendants subsequently filed the Blackstone agreement with the SEC.

133. Further, on September 10, 2021, VNET entered into an acknowledgment letter with Bold Ally, which put VNET on notice of the Facility Agreement and its terms.[18] This letter

---

[18] *See* Schedule 13D Ex. 99.3, filed on April 8, 2022.

42

established that Individual Defendants, as executives of VNET, had access to and knew the parameters of the Facility Agreement, including that Sheng Chen's stake in VNET was used as collateral, that the Early Termination Provision was tied to VNET's share price staying above $8.50, and that there was a collateral value threshold of $63,000,000, which would be breached if VNET's ADS value dropped below approximately $11.80. Thus, Individual Defendants would have known about the risk that the Facility Agreement posed, and that he was in default of the agreement as early as November 2021 when VNET's share price fell below $8.50 and the collateral value threshold was breached.

134. Moreover, when Sheng Chen filed the Facility Agreement with his Schedule 13D on April 8, 2022, he altered the Facility Agreement to obscure the $8.50 price that would trigger the Early Termination Provision and omitted the collateral value threshold clause entirely. The other Defendants, having already entered into an acknowledgment letter with Bold Ally that they knew the terms of the Facility Agreement, had access to information that established that they either knew or recklessly disregarded the fact that Sheng Chen altered the Facility Agreement to mislead investors, and that he was continually in default of the Facility Agreement throughout 2022, thus subjecting VNET to the risk that Sheng Chen would have his shares seized and the Change of Control clauses contained in the Company's outstanding convertible bonds and domestic loans would be triggered, thus threatening the health of the Company.

F.     **That Defendants' Misrepresentations Involved VNET's Survival Bolsters Scienter**

135. Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned VNET's continued operation. Had Sheng Chen lost all of his shares due once the known default risk materialized, multiple Change of Control clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans would have been triggered, a violation so serious that post-Class Period reports indicated it threatened to shut down the entire Company.

43

136.     Therefore, especially in light of Bold Ally's numerous notices to Sheng Chen that Early Termination events were occurring, as well as Defendants' admitted knowledge through an acknowledgment letter with Bold Ally, *see* ¶80 above, it would be absurd to infer that VNET's most senior executives – including its founder, Executive Chairman, and owner of GenTao – were unaware of the undisclosed risk that Sheng Chen's defaulting on the Facility Agreement posed.

### G.     Defendants Had Significant Motivation to Mislead Investors and Conceal Sheng Chen's Default of the Facility Agreement

137.     Throughout the Class Period, Defendants were on notice of the terms of the Facility Agreement, the impact Gen Tao and Sheng Chen's default of the Facility Agreement would have on VNET, and that Gen Tao and Sheng Chen had already defaulted on the Facility Agreement multiple times before the Class Period began.

138.     Moreover, Sheng Chen wielded significant sway inside of VNET, as he was not only the founder and Executive Chairman of the Company, but also a member of the compensation committee of the VNET Board of Directors, which oversees the compensation of VNET's officers, and a member of the nominating and corporate governance committee of the VNET Board of Directors, which oversees the composition and compensation of the VNET Board of Directors.

139.     Consequently, Defendants had significant incentive to authorize and create hundreds of thousands of new VNET shares for the benefit of Sheng Chen, should Bold Ally ever exercise the Early Termination Provision.

140.     However, this issuance of shares required conferring a personal benefit on Sheng Chen that was neither specified in Sheng Chen's disclosed compensation nor authorized by any compensation plan. Further, issuing such a significant amount of new shares would, by necessity, prejudice smaller shareholders, which could cause investors to sell their VNET stakes, thereby driving the ADS price downward and making it more likely that Bold Ally would exercise the Early Termination Provision.

44

141.    Therefore, Defendants were motivated to hide both Sheng Chen's default of the Facility Agreement and VNET's plan to confer a significant, unauthorized benefit on its dominant executive.

## NO SAFE HARBOR

142.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward- looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of VNET who knew that the statement was false when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

143.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired VNET securities during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, Bold Ally, the officers and directors of the Company and/or Bold Ally, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in

45

Case 1:23-cv-11187-DEH    Document 64    Filed 05/23/25    Page 66 of 96

which Defendants are or were affiliated or have or had a controlling interest.

144.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, VNET securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are several hundred or potentially more than a thousand members in the proposed Class. VNET's most recent Form 20-F indicates that it has 182,142,651 outstanding shares. Owners of these shares and other members of the Class may be identified from records maintained by VNET or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

145.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

146.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

147.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of VNET;
- whether the Individual Defendants caused VNET to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading

46

statements;

- whether the prices of VNET securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

148.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

149.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- VNET securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold VNET securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

150.    The market for VNET's ADS shares was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, VNET ADS's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities

47

relying upon the integrity of the market price of VNET ADS securities and market information relating to VNET and have been damaged thereby.

151. During the Class Period, the artificial inflation of VNET's shares was caused by the omissions and/or misrepresentations particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about VNET's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of VNET and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' omissions and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

152. At all relevant times, the market for VNET ADS securities was an efficient market for the following reasons, among others:

(a) VNET ADS shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, VNET filed regular periodic public reports with the SEC;

(c) VNET regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) VNET was followed by securities analysts employed by brokerage firms who

48

wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

153. As a result of the foregoing, the market for VNET ADS securities promptly digested current information regarding VNET from all publicly available sources and reflected such information in VNET's ADS share price. Under these circumstances, all purchasers of VNET ADSs during the Class Period suffered similar injury through their purchase at artificially inflated prices, and a presumption of reliance applies.

154. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

<u>**COUNT I**</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

155. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

156. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

157. During the Class Period, Defendants omitted to state material facts necessary in order

49

to make the statements made, in light of the circumstances under which they were made, not misleading and made material affirmative misrepresentations concerning, *inter alia*, (i) Sheng Chen had already defaulted on the Facility Agreement; (ii) Early Termination events under the Facility Agreement had already occurred; (iii) Bold Ally was then free to exercise the Early Termination Provision contained in the Facility Agreement; (iv) accordingly, as a result of (i)-(iii), Sheng Chen's ownership stake in VNET was already subject to seizure; and (v) due to (iv), VNET was at risk of triggering of multiple Change of Control clauses contained in VNET's $850 million outstanding convertible bonds and domestic loans, a deficiency so serious that domestic Chinese reports indicated it threatened to shut down the entire Company. Such misrepresentations were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of VNET ADS securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire VNET ADS securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

158.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of VNET'S SEC filings and public statements described above, that were designed to influence the market for VNET ADS securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about VNET's risks.

159.    By virtue of their positions at and exercise of day-to-day authority over VNET, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the

50

Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

160. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and the executives actually controlling VNET's day-to-day activities, the Individual Defendants had knowledge of the details of VNET's internal affairs.

161. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their control and authority over VNET, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of VNET. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to VNET's businesses, operations, and financial condition. As a result of the dissemination of the aforementioned false and misleading statements, the market price of VNET securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning VNET's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired VNET securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

162. During the Class Period, VNET ADS securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and

51

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of VNET ADS securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of VNET ADS securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of VNET ADS securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

163. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

164. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Promulgated Thereunder Against Sheng Chen and VNET)**

165. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

166. During the Class Period, Sheng Chen and VNET employed devices and artifices to defraud, and carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other

52

Class members, as alleged herein; and (b) caused Plaintiffs and the other members of the Class to purchase VNET's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Sheng Chen and VNET engaged in additional deceptive conduct, including the alteration and manipulation of filed documents to conceal Sheng Chen's default under the Facility Agreement and the occurrence of an Early Termination event from disclosure, as well as making the omissions and misleading statements alleged in ¶¶62, 64-65, 67-68, 73, 81, 83, 88, & 94 above.

167.     Specifically, Sheng Chen and VNET employed the following devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in the following acts, practices and a course of conduct in an effort to keep his default under the Facility Agreement unknown to investors:

- Both failed to disclose the risks posed by the Event of Default and Early Termination Provision in the Facility Agreement and the control change clauses contained in the Company's $850 million outstanding convertible bonds and domestic loans;

- Sheng Chen materially and deceptively altered the version of the Facility Agreement he filed with the SEC on April 8, 2022 to omit the $8.50 price floor that triggers the Early Termination Provision to prevent investors from knowing that he was already in default of the Facility Agreement;

- Sheng Chen materially and deceptively altered the version of the Facility Agreement he filed with the SEC on April 8, 2022 to omit the Event of Default language so that investors would not discover that he was already in default; and

- VNET secretly arranged for Sheng Chen's pledged shares to be transferred into Restricted ADS, which would become saleable before the end of the Class Period.

168.     As a result of Defendants' fraudulent scheme and failure to disclose material facts, as set forth above, the market price for VNET's ADS securities was artificially inflated during the Class Period.

169.     In ignorance of the fact that market prices of VNET's publicly traded ADS shares were artificially inflated, and relying upon the integrity of the market in which the

Company's securities trade, and/or on the absence of material adverse information concealed from them as detailed herein, Plaintiffs and the other members of the Class acquired VNET ADSs during the Class Period at artificially high prices and were damaged thereby.

170.     At the time Defendants orchestrated this fraudulent scheme, Plaintiffs and other members of the Class were ignorant of its nature or existence.  Had Plaintiffs and the other members of the Class and the marketplace known the truth about this unlawful scheme, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired VNET's ADS securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices at which they did.

171.     As a direct and proximate result of Defendants' wrongful scheme, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

172.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) & (c) promulgated thereunder and are liable to Plaintiffs and the Class members who have been damaged as a result of such violations.

### COUNT III

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

173.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

174.     During the Class Period, the Individual Defendants participated in the operation and management of VNET, and controlled, directly and indirectly, the day-to-day conduct of VNET's business affairs.  Because of their senior positions and their actual exercise of authority, they knew the adverse non-public information about VNET's misstatement of risks.

175.     As officers and/or directors of a publicly owned company, the Individual Defendants

54

had a duty to disseminate accurate and truthful information with respect to VNET's risks to VNET's business, and to correct promptly any public statements issued by VNET which had become materially false or misleading.

176. Because of their control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the SEC filings and public statements which VNET disseminated in the marketplace during the Class Period concerning VNET's risks. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause VNET to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of VNET within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of VNET securities.

177. Each of the Individual Defendants, therefore, acted as a controlling person of VNET. By reason of their senior management positions and/or being directors of VNET, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, VNET to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of VNET and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

178. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by VNET.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: May 20, 2024

Respectfully submitted,
**POMERANTZ LLP**

*/s/ Louis C. Ludwig*
Joshua B. Silverman
Louis C. Ludwig
Christopher P.T. Tourek
10 South LaSalle, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Email: jbsilverman@pomlaw.com
          lcludwig@pomlaw.com
          ctourek@pomlaw.com

-and-

Jeremy A. Lieberman
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Email: jalieberman@pomlaw.com

56

*Lead Counsel*

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com
        rdawson@glancylaw.com

*Additional Counsel for Plaintiffs*

**HAO LAW FIRM**
Junbo Hao
Room 3-401 No. 2 Building
No. 1 Shuangliubei Street
100024 Beijing People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel for Wong Tan*

**ATTACHMENT 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE VNET GROUP, INC. SECURITIES
LITIGATION

23 Civ. 11187 (DEH)

**OPINION
AND ORDER**

DALE E. HO, United States District Judge:

In this action, Lead Plaintiff Wong Tan ("Lead Plaintiff") and Plaintiff Michael Semerak (together, "Plaintiffs") bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5, on behalf of themselves and other persons and entities that purchased or otherwise acquired VNET American depositary shares ("ADSs" or "VNET securities") between March 23, 2022, and February 17, 2023, inclusive (the "Class Period").

Defendant VNET is "an internet and data center service provider which operates throughout China." Am. Compl. ¶ 2, ECF No. 34. Defendant Josh Sheng Chen ("Sheng Chen") is a co-founder of VNET and has "served as the Executive Chairman of the Company's Board from the founding of the Company through the present." *Id.* ¶ 30. Defendant Jie Dong was the CEO from September 2022 through the end of the Class Period. *See id.* ¶ 31. Defendant Samuel Shen was the Company's CEO from September 2020 until September 2022. *See id.* ¶ 32. Defendant Tim Chen was the Company's CFO at all relevant times. *See id.* ¶ 33.

In substance, Plaintiffs allege that Defendants made misleading representations to conceal the fact that Sheng Chen was in default on a $50.25 million loan, threatening his controlling stake in VNET; this, in turn, risked triggering one of two conditions that together would accelerate more than $850 million in debts owed by VNET, and thereby threaten to shut down the company.

1

Defendants move to dismiss under Rules 8(a), 9(b), and 12(b)(6) for failure to state a claim.[1] *See* ECF No. 36.  For the reasons given below, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.  Specifically, Defendants' motion is granted as to Plaintiffs' scheme liability claim, which is duplicative of their Section 10(b) claim.  The motion is denied in all other respects.

## BACKGROUND

The following facts are taken from the Amended Complaint and are assumed to be true solely for purposes of adjudicating Defendants' motion.  *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

VNET (formerly known as 21Vianet, Inc.) went public in 2011.  Am. Compl. ¶ 4.  From the time VNET went public through the beginning of the Class Period, Sheng Chen, by virtue of his stake in VNET "controlled its Board of Directors for which he served as Executive Chairman, and maintained substantial voting power."  *Id.* ¶ 5.  "Just prior to the Class Period, Sheng Chen owned approximately 8.8% of total outstanding ordinary shares but had approximately 28.6% of the aggregate voting power due to his ownership of supra-voting share classes."  *Id.*

### A. Sheng Chen's Facility Agreement with Bold Ally and VNET's Financing Arrangements with Blackstone and Citicorp

On August 19, 2021, Sheng Chen—through a personal holding company of which he is the sole owner and operator, GenTao—entered into a loan agreement (the "Facility Agreement") to obtain a $50.25 million loan from a company called Bold Ally (Cayman) Limited ("Bold Ally").  *Id.* ¶¶ 3, 6.  "Under the Facility Agreement, which was known to VNET and its senior executives at all relevant times, Sheng Chen personally guaranteed the loan and pledged all of his shares in

---

[1] Unless otherwise stated, all references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

2

VNET and those held by his personal holding companies as collateral . . ." *Id.* ¶ 6. The Facility

Agreement had two key provisions:

- **The Early Termination Provision**. The Facility Agreement had an early termination clause which stated that if VNET's securities' share price fell below a $8.50 for two consecutive trading days, Bold Ally could cancel the loan and demand full payment on the loan within ten business days of notice. *See id.* ¶¶ 7, 55.

- **The Event of Default Provision**. "The Facility Agreement also contained a provision under which it would be an event of default if a calculation of certain pledged Class A shares fell below a threshold of $63,000,000, which would occur if the ADS share price dropped below approximately $11.80." *Id.*

In November and December 2021, the price of VNET ADSs dropped, triggering both provisions.

*See id.* ¶¶ 8-9. Around that time, Bold Ally notified Sheng Chen of his default on the Facility

Agreement and that an "Early Termination" event had occurred. *Id.* ¶ 12.

Separately, in early 2022, "VNET entered into hundreds of millions of dollars' worth of

convertible debt and other financings which contained provisions requiring that Sheng Chen

maintain his level of control within VNET . . . " (the "Financing Arrangements"). *Id.* ¶ 11. This

included $250 million from funds managed by Blackstone Tactical Opportunities ("Blackstone").

*Id.* ¶ 45. A Change of Control provision of the Blackstone Notes allowed Blackstone to redeem

their convertible notes early if a "fundamental change" occurred. *Id.* As specified in the Notes,

one such fundamental change was if (1) "Sheng Chen 'ceases to be the largest holder of the

Company's voting power represented by all voting securities of the Company," and (2) Sheng

Chen "has resigned from the Board, or been removed from the Board by the Board or the

Company's shareholders[.]" *Id.* "[S]imilar clauses existed in other convertible bonds and

domestic loans" with Citicorp International Limited ("Citicorp"). *Id.* ¶ 46; *see* Defs.' Mem. in

Supp. of Mot. to Dismiss at 6 n.5 ("Defs.' Br."), ECF No. 37 (noting that "Plaintiffs do not cite the

Citicorp Notes by name [in the Amended Complaint], but repeatedly reference them as part of

'VNET's $850 million outstanding convertible bonds and domestic loans.' (*See, e.g.*, AC ¶ 15.)").[2] Together, the notes "totaled over $850 million." Am. Compl. ¶ 46.

Plaintiffs allege that, as a consequence of the Change of Control provisions of VNET's Financing Arrangements, Sheng Chen's "Facility Agreement did not just impact Sheng Chen, but instead VNET as a whole, as it created a significant and destructive risk in the event that Sheng Chen ever defaulted on the loan." *Id.* ¶ 57. That is, Sheng Chen's default on the Facility Agreement threatened his controlling voting stake in VNET, thus increasing the risk of triggering the Change of Control provisions of VNET's Financing Agreements and exposing VNET to early redemption of more than $850 million worth of notes, which "threatened to shut down the entire Company." *See id.* ¶¶ 15, 57.

**B. Subsequent Developments and Defendants' Allegedly False and/or Misleading Disclosures**

On March 31, 2022, VNET held its Fourth Quarter 2021 Earnings Call, during which Defendant Samuel Shen referenced the Blackstone Notes. *See id.* ¶ 67. There was no mention made, however, of the Change of Control Provision in the Notes, or of the fact that, under the terms of Sheng Chen's Facility Agreement with Bold Ally, Bold Ally "had the right to seize Sheng Chen's significant ownership stake in VNET. . . ." *Id.* ¶¶ 15, 69.

On April 6, 2022, Sheng Chen, his personal holding companies, and Bold Ally entered into an agreement known as the "Standstill Agreement." *Id.* ¶ 12. The Standstill Agreement, *inter alia*,

> (a) acknowledged that Sheng Chen was notified in November 2021 of his default of the Facility Agreement and the consequences resulting therefrom; (b) acknowledged that an Early Termination event had occurred in late 2021; [and] (c) arranged for the transfer of Sheng Chen's pledged shares into Restricted ADSs, so that after the passage of the

---

[2] On a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

[requisite] restriction time under SEC Rule 144, Bold Ally could sell the ADS shares on the open market . . . .

*Id.*

On April 8, 2022, Sheng Chen filed a Form Schedule 13D acknowledging that he pledged all the VNET shares beneficially owned by him as collateral for the Facility Agreement. *See id.* ¶ 73.[3] But it "made no mention that both an Event of Default and an Early Termination event [under the Facility Agreement] had already occurred . . . ." *Id.* ¶ 14. It did, however, disclose and attach a redacted version of the August 2021 Facility Agreement. *Id.* ¶ 13. This redacted version of the Facility Agreement "replaced the actual trigger price of $8.50" per share set forth in the Early Termination Provision "with a series of asterisks." *Id.* Plaintiffs allege that, had the trigger price not been redacted from the document, investors could have "discover[ed] independently that an Early Termination event had already occurred . . . ." *Id.* Similarly, with respect to the Event of Default Provision, the definition of an "Event of Default" was replaced with a series of asterisks, concealing that this provision had also already been triggered. *Id.*

On April 26, 2022, VNET filed its annual report Form 20-F for the period ended December 31, 2021. *See id.* ¶ 81. The 2021 20-F described Sheng Chen's Facility Agreement with Bold Ally and noted that Sheng Chen had pledged his VNET shares as collateral, but it did not disclose that he was in default and that Bold Ally had the right to seize his shares. *See id.* ¶ 82.

### C. Drop in VNET Share Price

A series of subsequent disclosures revealed the details of the Facility Agreement and Sheng Chen's default. First, "[o]n February 13, 2023, before the market opened, Bold Ally announced

---

[3] Paragraphs 73-80 of the Amended Complaint appear to erroneously refer to Sheng Chen's April 8, 2022 Form Schedule 13D as a Form Schedule 13G.

[that Sheng Chen was in default on the Facility Agreement and that] it would exercise its rights under the loan." *Id.* ¶¶ 16, 98.

> Then, on February 15, 2023, before the market opened, Defendants announced that they had taken action to replace the voting interests that Sheng Chen lost when his shares were seized by creating and authorizing the issuance of up to 555,000 newly created Class D ordinary shares to Sheng Chen that carried 500 times the voting power of Class A shares.

*Id.* ¶¶ 18, 102. Two days later, "on February 17, 2023, Sheng Chen filed with the United States Securities and Exchange Commission [an] amended Schedule 13D which acknowledged that VNET knew of the Facility Agreement," that he had been notified by Bold Ally several times that he was in default, and that Sheng Chen's VNET shares held through his personal holding company GenTao had been transferred to Bold Ally. *Id.* ¶¶ 20, 107.

The price of VNET ADSs dropped following each of these disclosures. "In total, from February 13, 2023, to February 21, 2023, VNET's ADS share price fell by $2.01, or 31.85%, in response to the disclosure of Sheng Chen's default, Bold Ally's seizure, and the newly created shares." *Id.* ¶¶ 21, 100, 106, 108-09.

## LEGAL STANDARDS

### A. Pleading Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In assessing the complaint, [a court] must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. However, the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

6

A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake." In concrete terms, this means that "a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). The PSLRA "expanded on the Rule 9(b) standard." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012). The PSLRA requires that a plaintiff "(1) specify each misleading statement, (2) set forth the facts on which a belief that a statement is misleading was formed, and (3) state with particularity facts giving rise to a strong inference that the defendant acted with scienter—the required state of mind." *Set Cap. LLC*, 996 F.3d at 75.

## B. Section 10(b)

"To state a cause of action under Section 10(b) . . . , a plaintiff must plead [1] that the defendant made a false statement or omitted a material fact, [2] with scienter, and [3] that plaintiff's reliance on defendant's action caused plaintiff injury." *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004). SEC Rule 10b-5 implements Section 10(b)'s prohibition on false or misleading statements and makes it unlawful for issuers of registered securities to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b) (2022). The Supreme Court "has found a right of action implied in the words of [§ 10(b) of the Exchange Act] and its implementing regulation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, Inc., 552 U.S. 148, 157 (2008).

7

## DISCUSSION

**I.    Section 10(b)**

Defendants argue that the Complaint fails to adequately plead any of the three elements of a 10(b) claim.  The Court considers each in turn.

### A. False or Misleading Statement

#### 1. Standard for a Material Misrepresentation

To adequately allege a material misrepresentation, a plaintiff must allege particularized facts showing that the statement "was false at the time it was made." *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 230 (S.D.N.Y. 2023).  The challenged misstatement must be both (1) false or misleading and (2) material.  *See Leadersel Innotech ESG v. Teladoc Health, Inc.*, No. 23 Civ. 1112, 2024 WL 4274362, at *2 (2d Cir. Sept. 24, 2024) (citing *Singh v. Cigna Corp.*, 918 F.3d 57, 62-63 (2d Cir. 2019)).

##### a. False or Misleading

SEC Rule 10b-5 prohibits "two things": (1) "any untrue statement of a material fact—*i.e.*, false statements or lies," and (2) "omitting a material fact necessary to make the statements made . . . not misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263 (2024).  With respect to the second category, "[SEC] Rule 10b-5(b) does not proscribe pure omissions," *id.* at 264—that is, "when a speaker says nothing, in circumstances that do not give any particular meaning to that silence," *id.* at 263.  Rather, the Rule only "prohibits omitting material facts necessary to make the statements made . . . not misleading. Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete . . . ." *Id.* at 264; *see also Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 421 (S.D.N.Y.

8

2023) ("[A]lthough [SEC] Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a duty to be both accurate and complete.").

b. Materiality

"The standard of materiality is whether the omitted fact 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Shapiro*, 652 F. Supp. 3d at 421 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

> [B]ecause of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

*In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015), *aff'd sub nom.*, *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014)).

2. **Application**

Here, Plaintiffs allege that Defendants made multiple material misleading statements in March and April 2022, by referencing and describing the Facility Agreement between Sheng Chen and Bold Ally and the VNET Financing Arrangements with Blackstone and Citicorp, but redacting information to conceal "the fact that Sheng Chen had already defaulted on the Facility Agreement," thus "increasing the risk that Bold Ally would seize his shares and cause change in control provisions to be triggered" under the Financing Arrangements. Pls.' Opp'n at 7, ECF No. 39. In their memorandum of law in support of their motion to dismiss, Defendants raise two arguments.

First, citing the Supreme Court's recent decision in *Macquarie*, Defendants contend that "Plaintiffs' claims fail as a matter of law because they are based on an alleged failure to disclose, not on any affirmatively false or misleading statements." Defs.' Br. at 11. As noted, Defendants are correct that the Supreme Court made clear in *Macquarie* that "[SEC] Rule 10b-5(b) does not

9

proscribe pure omissions." 601 U.S. at 264. But that does not mean that a claim cannot be premised in part on the omission of information. Under *Macquarie*, "representations that state the truth only so far as it goes, while omitting critical qualifying information"—or "half-truths"—remain actionable under SEC Rule 10b-5. *Id.* at 263. SEC Rule 10b-5 "requires disclosure of information necessary to ensure that statements already made are *clear and complete.*" *Id.* at 264 (emphasis added).

Here, it is not the case, as Defendants suggest, that "Plaintiffs' case is based on *pure* omissions." Defs.' Br. at 11 (emphasis added). Rather, Plaintiffs allege that "Defendants made affirmative statements about the Facility Agreement, VNET's financings, and the risks to VNET's ADSs, and did so in a deceptively incomplete fashion." Pls.' Opp'n at 8. This is perhaps most clear with respect to the April 2022 Schedule 13D, which attached a redacted version of Sheng Chen's Facility Agreement with Bold Ally, and from which was obscured: (1) the trigger price of $8.50 per share from the Early Termination Provision; and (2) the definition of an "Event of Default" from the Event of Default Provision. *See* Am. Compl. ¶¶ 13-14. While these redactions are technically "omissions," they are so precisely targeted to material information in the Facility Agreement as to render the filed documents misleading. "[A]lthough [SEC] Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a duty to be both accurate and complete." *Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 421 (S.D.N.Y. 2023). In essence, Defendants argue that they may publicize documents from which the most critical information is redacted, even if doing so creates a misleading impression about information that is material to investors. *Macquarie* does not support that proposition.

Second, Defendants argue that their statements were not misleading because, under the actual terms of the debt agreements with Blackstone and Citicorp, there was never a real risk of a

10

change of control of VNET. *See* Defs.' Br. at 12-15. For example, the Blackstone Notes provide for acceleration of the debt when two conditions are met: (1) Sheng Chen ceases to be the largest holder of voting power in VNET; and (2) he resigns from or is removed from the VNET Board. *See* Am. Compl. ¶ 45. Defendants note that neither condition ever actually occurred. Defs.' Br. at 13. And while Bold Ally may have had the right to seize Sheng Chen's VNET shares, "Plaintiffs do not allege that Mr. Chen ever . . . was at risk of resigning or being removed" from the VNET Board. *Id.* Thus, according to Defendants, Sheng Chen's default on the "Facility Agreement ha[d] no bearing on VNET's Blackstone Notes and Citicorp Notes," because even if Bold Ally seized his VNET shares, there was never a risk of the second condition for acceleration of the Blackstone and Citicorp Notes (i.e., Sheng Chen's removal or resignation from the Board). *Id.* at 15. Thus, Defendants contend, their alleged concealment of Sheng Chen's default was immaterial.

The Court does not agree. Plaintiffs have alleged that, as a result of Sheng Chen's default on the Facility Agreement, Bold Ally had the right to seize his VNET holdings. *See* Am. Compl. ¶¶ 8-12. Plaintiffs have therefore alleged that there was a possibility that Sheng Chen would cease to be the largest holder of VNET voting power. Defendants do not meaningfully dispute that this risk had materialized. *Cf. In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized."). Moreover, Defendants' characterization of this as having "no bearing on VNET's Blackstone Notes and Citicorp Notes" is an overstatement, because if Sheng Chen ceased to be the largest holder of voting power in VNET, that would trigger one of the two conditions for acceleration of VNET's very large debts with Blackstone and Citicorp, creating an increased risk to VNET's ability to continue to operate. And once this risk became public, VNET's share price dropped precipitously.

11

*See* Am. Compl. ¶¶ 16-21, 98-111.  The fact that, ultimately, a change in control never came to pass does not mean that Plaintiffs have failed to state a claim with respect to Defendants' concealment of the risk of triggering one of the conditions for such a change in control.  *Cf. In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 315 (S.D.N.Y. 2013) (denying motion to dismiss where defendants' "disclosures did not specifically reveal the particular risks allegedly known to [them]").  Accordingly, the Court concludes that Plaintiffs have adequately alleged misleading material statements.[4]

## B.  Scienter

### 1.  Standard for Scienter

"[A] complaint must, with respect to each defendant and with respect to each act or omission alleged to constitute securities fraud, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Bristol-Myers*, 658 F. Supp. 3d at 230; *see also* 15 U.S.C. § 78u-4(b)(2).  Scienter can be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (describing pre-PSLRA standard for scienter in the Second Circuit and noting that the PSLRA "did not change the basic pleading standard for scienter in this circuit").  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the

---

[4] Defendants also take issue with various other statements that Plaintiffs allege are misleading.  *See, e.g.*, Defs.' Br. at 15-16 (arguing that "[t]here is nothing remotely false or misleading about" statements made by CFO Tim Chen and CEO Samuel Shen regarding "VNET's financing goals" during the "fourth quarter 2021 earnings announcements on March 30, 2022").  However, because the Court concludes that Plaintiffs have alleged at least some actionable materially misleading misstatements sufficient to establish the first element of a Section 10(b) claim, it does not address the other arguments raised by Defendants.

12

facts alleged.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (alterations in original) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).

### 2. Application

Here, Plaintiffs allege the Defendants had actual notice of Sheng Chen's default on the Facility Agreement. *See* Am. Compl. ¶¶ 50-61, 70-71, 86, 107, 112-17, 131-34. Sheng Chen—who was party to the Facility Agreement—was notified several times by Bold Ally of his breach. *See, e.g., id.* ¶¶ 20, 86, 107, 112-17. Defendants were also aware of the terms of VNET's Financing Arrangements with Blackstone and Citicorp. *See, e.g., id.* ¶¶ 132-34. And Plaintiffs have alleged that Defendants redacted the precise information that would have enabled investors to realize that Sheng Chen's default had occurred. *See id.* ¶¶ 13-14. "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).

Defendants raise three arguments in response. First, they contend that their knowledge of Sheng Chen's default on the Facility Agreement cannot give rise to an inference of scienter because they had no duty to disclose this fact in the first place. *See* Defs.' Br. at 23. This is, in essence, a repackaging of their argument that omissions cannot form the basis for liability under Section 10(b). But because the Court concludes that Defendants' failures to fully disclose the terms of the Agreement were material misrepresentations, Defendants knowledge of that information (which they do not deny) constitutes a basis to infer scienter.

13

Next, Defendants argue that Plaintiffs have failed to allege that Defendants actually believed that Sheng Chen's default on the Facility Agreement created a risk of triggering the change of control provisions in the Blackstone or Citicorp Notes. *See id.* This, too, is essentially a repackaging of an argument raised by Defendants on the material misrepresentation element (i.e., that there was no real risk of the Blackstone and Citicorp debts being accelerated), which the Court also rejects for the reasons stated above. As noted *supra*, Sheng Chen's default created the very real risk that one of the two conditions for acceleration of the Blackstone and Citicorp debts would occur. Defendants' misrepresentations about Sheng Chen's default, and thus Defendants' knowledge of the default, is a basis to infer scienter.

Finally, Defendants assert, with respect to the Individual Defendants aside from Sheng Chen, that their roles as high-level executives responsible for VNET's "core operations" are not, by themselves, a basis to infer scienter. *See id.* But that is not what Plaintiffs have alleged—rather it is that Defendants, by virtue of the respective roles, had access to specific information (i.e., the terms of the Facility Agreement and the Financing Arrangements), that was redacted from public statements, rendering those statements misleading. *See In re Aphria, Inc. Sec. Litig.*, No. 18 Civ. 11376, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020), *reconsideration denied*, 2021 WL 4442818 (S.D.N.Y. Sept. 28, 2021) (holding that scienter was established where CEO and CFO had access to information that contradicted their public statements). That is sufficient for scienter.[5]

---

[5] Because the Court concludes that Plaintiffs have adequately alleged scienter on the basis of the access to and notice of concealed information, it does not address the parties' arguments regarding an alternative basis for inferring scienter based on evidence of a motive to defraud. *See* Defs.' Br. at 22; Pls.' Opp'n at 19.

14

## C. Loss Causation

### 1. Standard for Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). "[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 173. Loss causation is adequately pled where a plaintiff alleges either "(a) . . . that the market reacted negatively to a corrective disclosure of the fraud; or (b) that that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters*, 750 F.3d at 232-33. The Second Circuit has not decided whether Rule 9(b)'s heightened pleading standard applies to loss causation, *see Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 n.65 (2d Cir. 2020), but it has stated that "Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

### 2. Application

Here, Plaintiffs allege that three disclosures in February 2023 revealed Sheng Chen's default on the Facility Agreement and its potential impact on VNET: (1) the disclosure on February 13, 2023, of Sheng Chen's default and Bold Ally's initial seizure of shares; (2) the February 15, 2023, issuance of new shares to Sheng Chen, which revealed the magnitude of the threat to his control of VNET; and (3) the February 17, 2023, disclosure that Sheng Chen had been notified

multiple times of his default, which had not been disclosed previously to investors.  *See* Am. Compl. ¶¶ 98, 102, 107.  Each of these revelations was accompanied by a decline in VNET's share price.  *See id.* ¶¶ 100, 106, 108-09.  "[I]f a plaintiff relies upon a particular disclosure as the basis for his loss causation allegations, that disclosure must somehow reveal to the market some part of the truth regarding the alleged fraud."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008).  Here, the disclosures identified by Plaintiffs revealed to the market some part of the truth regarding the risk to VNET caused by Sheng Chen's default, and Plaintiffs allege that the market responded accordingly.

Defendants' lone counterargument is that these disclosures did not constitute revelations of previously-concealed information, but rather "new developments," which cannot form the basis for loss causation.  Defs.' Br. at 24-25.  But that is not correct.  The fact of Sheng Chen's default, Bold Ally's entitlement to seize his shares, and the risk that this posed to VNET under the Financing Arrangements were not "new developments" in February 2023.  True, the fact that these dangers had more fully matured, with Bold Ally now making an initial seizure of Sheng Chen's collateral, was a new development—but the publication of that event revealed existing facts that had been misleadingly concealed until that point.

## II.  Remaining Issues

### A.  Scheme Liability

To state a claim for scheme liability under SEC Rule 10b-5, Plaintiffs must plead that Defendants "(1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter."  *Sec. & Exch. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 319 (S.D.N.Y. 2019) (quoting *Sec. & Exch. Comm'n v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (citations omitted)).  A "manipulative or deceptive" act is "some act that gives the

16

victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008). But "misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections." *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005)). Plaintiffs must "clearly identify any deceptive acts distinct from the alleged . . . misstatements and omissions." *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22 Civ. 355, 2024 WL 2890968, at *5 n.5 (2d Cir. June 10, 2024).

Defendants argue that Plaintiffs' scheme liability claim should be dismissed because it is duplicative of their Section 10(b) claim. *See* Defs.' Br. at 25. The Court agrees. Although Plaintiffs argue that their scheme liability claim is distinct because it is premised on "[m]anipulating paperwork" in the form of deceptive redactions to the Facility Agreement, Pls.' Opp'n at 23, these redactions are (part of) the basis on which the Court determined that Plaintiffs have stated a claim under Section 10(b). Accordingly, Plaintiffs' scheme liability claims are dismissed a duplicative.

### B. Control Person Liability

Finally, Defendants argue that Plaintiffs' control person claims under Section 20(a) must be dismissed on the grounds that Plaintiffs have failed to plead a Section 10(b) claim, which is a prerequisite to a successful claim under Section 20(a). *See* Defs.' Br. at 25. Because the Court rejects Defendants' arguments with respect to Plaintiffs Section 10(b) claim, this argument fails.

17

## CONCLUSION

For the reasons given above, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion is granted as to Plaintiffs' scheme liability claim and denied in all other respects.

An order scheduling an Initial Pretrial Conference in this matter shall issue separately. The Clerk of Court is respectfully directed to close the motions at ECF. No. 36.

SO ORDERED.

Dated: September 15, 2025
New York, New York

_____

DALE E. HO
United States District Judge

18